(Decided 12th April, 1888.)

---

## HENRY J. SPENCER *vs.* STATE OF MARYLAND.

*Murder—Insanity as a Defence—Evidence—Test of Insanity.*

On a trial for murder the facts and circumstances of the killing, and the plan and deliberation by and with which the act was done, having been shown, the counsel for the prisoner proposed to prove by him that his wife died some three years before the murder; and that some time previous to her death she had complained to him of illness, the cause of which she attributed to a felonious assault made upon her by the deceased, and that the prisoner believed that the assault was the immediate cause of her death; that this fact fastened itself upon his mind, to the

Spencer *vs.* State.

exclusion of all other thoughts, and that from the death of his wife to the date of the homicide he was nervous and restless, and that it was impossible for him to remain long at one employment, by reason of this condition; that the dead body of his wife, with the scars inflicted by the deceased, would appear to him in his dreams, and he was constantly followed and haunted with the idea that, so long as the deceased lived, he, the prisoner, would have no rest or peace of mind, and that he could exercise no power of will or self-control over this idea, and that since the death of the deceased he, the prisoner, had found rest, and peace and quiet. This testimony, on the objection of the State, the Court excluded, the counsel for the prisoner declining to give the assurance that they would follow up the proof of the facts embraced in the proffer, with other proof tending to show that at the time of the homicide the prisoner was insane, or deranged, and thereby rendered irresponsible for his acts. The counsel for the prisoner then proposed to ask him this question: "Did you observe any change in your mental condition after the death of your wife, and, if so, state what that change was, and how it affected you?" To this testimony the State objected, and the Court excluded the same, the prisoner by his counsel refusing to give the assurance that the testimony sought by the question, would be followed up by other proof tending to show that, at the time of the homicide, the prisoner was insane or deranged, and thereby rendered irresponsible for his acts. On appeal it was HELD:

That the evidence sought to be introduced was not admissible as tending to show insanity on the part of the prisoner, at the time of the commission of the offence, or at the time of the trial; nor was it admissible to reduce the degree of the crime, in the face of evidence, that of the prisoner included, that there was the most deliberate premeditation in the perpetration of the offence.

If the party accused of a criminal offence be competent to form and execute a criminal design, or, if, at the time of the commission of the alleged offence, he had capacity and reason sufficient to enable him to distinguish between right and wrong, and understand the nature and consequences of his act as applied to himself, he is a responsible agent, and amenable to the criminal law of the land for the consequences of his act.

APPEAL from the Circuit Court for Alleghany County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, STONE, MILLER, ROBINSON, IRVING, and BRYAN, J., for the appellant, and submitted on brief for the appellee.

*J. W. Thomas,* for the appellant.

Was it competent for the traverser to show by his own testimony that the thought of the intense suffering and ultimate death of his wife, as the result of the injuries· inflicted upon her by Dawson, fastened itself upon him to the exclusion of all others; that from that time forth he experienced a steadily increasing, restless and disturbed condition of mind; that he could no longer exercise the power of will or self-control, or choose between peace and war with the deceased? This was material, and therefore as competent for the traverser to testify to it as any other witness. *Fenwick vs. State,* 63 *Md.,* 242; *Owings' Case,* 1 *Bland,* 370; 8 *Gray,* 508; 7 *Allen,* 155; 60 *N. Y.,* 223; 6 *East,* 188; 3 *Swabey & Trist.,* 143; *Whar. Crim. Ev.,* 272, 693.

When the nature, essence and degree of a crime are made by law (as murder in this State) to depend upon the peculiar state of the criminal's mind at the time, whatever tends to show his mental condition, is of the most vital importance, and a subject of proper inquiry and consideration by the jury. *Hopt vs. People,* 104 *U. S.,* 631; *State vs. Johnson,* 40 *Conn.,* 136; *Goodrich's Case, Gans' Crim. Law,* 123; 75 *Pa.,* 403; 14 *Ohio,* 556; 1 *Gray,* 337; 8 *Gray,* 508; 7 *Allen,* 155; 60 *N. Y.,* 221; 9 *Humph.,* 663; 11 *Humph.,* 154; 21 *Cal.,* 544; 31 *Cal.,* 466; 43 *Cal.,* 344; 41 *Conn.,* 584; 43 *Tex.,* 503; 1 *Tex. Ct. App.,* 488; 19 *Mich.,* 401; 11 *Minn.,* 154; 8 *Bush (Ky.),* 463; 20 *Wis.,* 74; 40 *Ind.,* 263; 63 *Ind.,* 278; 21 *Mo.,* 446; 68 *Mo*., 305; 48 *Barb.,* 274; 50 *Barb.,* 266; 32 *La. An.,* 1086; 2 *Lea (Tenn.),* 575; 1 *Bish. Crim. Law,* 490.

This case is distinguishable from the case of *Gross vs. State*, 62 *Md.*, 179, in that the degree of offence there was in no way contingent upon mental infirmity; and the Court very properly held that evidence of an impaired mind, in such a case, could only be offered as an excuse for the crime, and as such must measure up to the standard of irresponsibility.

The evidence proffered tended to show not only a diseased condition of mind, but a complete destruction of will-power—hence, incapacity to choose between right and wrong. This, it would seem, was sufficient. The old English doctrine of power to distinguish between right and wrong has been repudiated by the more modern and advanced authorities as imperfect, fallacious and absurd. It is now an admitted fact in science, and in law, that confirmed insanity is often accompanied by a consciousness of the difference between right and wrong, and a keen appreciation of the consequence of the act. Destruction of the will-power, though co-existing with a knowledge of right and wrong, would seem, therefore, to be the true test of criminal responsibility, and the one which the Courts are now fast adopting. *Parsons vs. State*, 81 *Ala.*, 577; *Com. vs. Mosler*, 4 *Barr*, 265; *Com. vs. Rogers*, 7 *Metc.*, 500; *Lynch's Case*, 25 *Pitts., L. J.*, 193; *People vs. Kleim*, 1 *Edm. Sel. Cases*, 13.

*Wm. Pinkney Whyte, Attorney-General,* for the appellee.

ALVEY, C. J., delivered the opinion of the Court.

The prisoner, the appellant in this case, was indicted for the murder of Winfield S. Dawson on the 27th of July, 1887. The prisoner was tried upon the plea of not guilty, and was found guilty of murder in the first degree. The crime was committed in Alleghany County, and the prisoner was tried and convicted at the October term of the Circuit Court for that county, 1887.

In the course of the trial, the prisoner took two bills of exception to the refusal of the Court to admit certain evidence proffered by him; and the rulings of the Court, as stated in those exceptions, form the only subjects of review on this appeal.

In the first bill of exception, it is stated that the State, in support of the prosecution, proved by a witness, by the name of Hudson, that Dawson, the deceased, lived with his family on witness's farm. He knew the prisoner; he was a laborer. He saw Spencer, the prisoner, in March last, talking with Dawson, the deceased. That, on the day of the shooting, he was sitting on his porch and heard a shot, and saw the wife of the deceased running toward him. He then went to his front gate and saw Dawson on the ground resting on his elbows. The prisoner was standing over him with a pistol, and fired it at Dawson. The deceased then fell back and witness did not see him move again. When Mrs. Dawson started down the road to her husband, the prisoner said to her: "If you come any further I will blow your damn brains out." That the prisoner then turned to the body of Dawson and said, "I will not leave you until the last breath is out." The prisoner remained there a few minutes, and then went down the road.

In corroboration of this statement of the witness Hudson, the testimony of several other witnesses was produced. And the State then proved by Mrs. Sarah Dawson, the widow of the deceased, that on the evening of the day of the murder the prisoner came to her house, and talked pleasantly with her and her husband; that she told him he was looking badly, and he replied that he was on the sick list; that the prisoner then asked her husband to walk down the road with him, as he had something to say to him; that they then went off down the road together, and shortly thereafter she heard the first shot.

The State then proved by Andrew Dawson, that the prisoner had been away from the county since March, 1887; that he came to the house of witness on Sunday, five days before the murder, and said he was on the sick list; that he had come from Harford County, and had come to Rawlings station to see his girl, Miss Shepherd; that the prisoner left the house of witness on Wednesday, saying he was going to Barton to see his brother; that the next time the witness saw the prisoner was at Rawlings station after the shooting; that the prisoner then told witness he had come up to Rawlings to kill Scott Dawson, and that he had done it, and he thanked God for it; and that the prisoner slapped his breast and said the nerve in there had prompted him to do it. And this witness, on cross-examination, testified that the prisoner was calm and sober at the station; that witness was the brother-in-law of the prisoner, the latter having married witness's sister; that the wife of the prisoner had been dead about three years, and that about nine years before, Scott Dawson, the deceased, had been convicted and sentenced to the penitentiary for five years, for an attempted assault upon witness's sister; that while Scott Dawson was in prison, the accused married the sister of witness; and that Scott Dawson had been home from the penitentiary about two years before he was killed.

The State then proved, by M. T. Dawson, that he saw the prisoner the evening of the murder at Rawlings station, and that the prisoner asked witness if he had heard what he, the prisoner, had done; that witness replied he had not, and the prisoner then said, "I have shot Scott Dawson; I shot him for the crime he committed, for which he was sent to the penitentiary."

The State rested its case, and the prisoner was then sworn as a witness in his own behalf, and he testified that he was 27 years of age; that he was born and raised at Rawlings station, and lived there most of his life; that he was married in 1882, to Rachael Dawson, who died about three years prior to the time of his testifying, and that since her death he had had no settled place to live: That he returned to Rawlings station on the 24th of July, 1887, and met Scott Dawson at his, Dawson's house, on the evening of the 27th of July, 1887; that he and Dawson left the house and walked down the road together; and that he then spoke to Dawson about the wrongs he, Dawson, had done to his, the prisoner's wife, before her marriage; that he asked Dawson if he did not think he had done wrong and deserved to die for it; that Dawson replied he did not know but what he did, and witness then said, "Scott, that is my business here, and I will kill you for it, or die by your side;" and drawing his reovlver he fired, Dawson fell down, and he, the prisoner, then fired the second shot at him: That he, the prisoner, then went down to the station, and he there told Andrew Dawson that the nerve or heart in his left breast made him do it. That he purchased the pistol in Baltimore as he came through, and that he had come home on purpose to shoot Dawson. That he had told Andrew Dawson he had come home to see Miss Shepherd, but that was not true: That he had put off shooting Dawson so long, because he hated to do it, and that he took Dawson down the road, because he did not like to shoot him at the house in the presence of his wife: That he did not know whether Dawson was armed or not, but saw him take a knife from his pocket, but he did not make an effort to use it.

After thus stating the facts and circumstances of the killing, and the plan and deliberation by and with

which the act was done, the counsel for the prisoner proposed to prove by him, that in July, 1884, the prisoner's wife died, and that some time previous to her death she had complained to him of illness, the cause of which she attributed to a felonious assault made upon her by the deceased, and that the prisoner believed the assault was the immediate cause of her death; that this fact fastened itself upon his mind to the exclusion of all other thoughts, and that from the death of his wife to the date of the homicide, he was nervous and restless, and that it was impossible for him to remain long at one employment, by reason of this condition: That the dead body of his wife, with the scars inflicted by the deceased, would appear to him in his dreams, and he was constantly followed and haunted with the idea, that so long as the deceased lived, he, the prisoner, would have no rest or peace of mind, and that he could exercise no power of will or self-control over this idea, and that since the death of Dawson, he, the prisoner, has found rest, and peace and quiet. To the proffer thus made, the State objected, and the Court ruled the whole proffer inadmissible, unless the counsel for the prisoner would assure the Court that they would follow up the proof of the facts embraced in the proffer, with other proof tending to show that, at the time of the homicide, the prisoner was insane or deranged, and thereby rendered irresponsible for his acts. This assurance the counsel refused to give, and, consequently, all the facts embraced in the proffer were excluded. This ruling formed the subject of the first exception.

After the ruling just stated, the counsel for the prisoner proposed to ask him this question: "Did you observe any change in your mental condition after the death of your wife ? and if so, state what that change was and how it affected you." To this the State ob-

jected, and the Court sustained the objection, unless assurance was given that the testimony sought by the question would be followed up by other proof tending to show that, *at the time of the homicide*, the prisoner was insane or deranged, and thereby rendered irresponsible for his acts. This assurance the prisoner by his counsel refused to give, and the testimony was excluded. This ruling forms the subject of the second exception.

We have thus fully stated the facts of the case, as set forth in the bills of exception, in order that it may distinctly appear how, and under what conditions and state of case, the questions arose and were ruled upon by the Court below. As will be observed, there was no specific object avowed for which the evidence was sought to be introduced. But if the evidence be of a nature to make it admissible for any legitimate purpose, according to established modes of proof, whether to negative the existence of a criminal responsibility of the accused, or to reduce the degree of the crime, it was error to exclude it. But was it legitimate and competent evidence, *per se*, to be submitted to the jury to be considered by them in determining either of those questions? It is insisted by counsel for the prisoner that the evidence was admissible to prove insanity; to show that the prisoner had not sufficient power of will to resist a violent impulse which impelled him to the commission of the act, and by which impulse he was deprived of power of choosing between right and wrong. But whether admissible for that purpose or not, it is urged that it was at least admissible as tending to show an absence of the malicious premeditation with which the murder was charged to have been committed, and would have afforded a warrant to the jury in finding the prisoner guilty of a less degree of crime than murder in the first degree. We will examine these contentions in the order stated.

Spencer *vs.* State.

1. Was the evidence admissible to prove insanity, that is to say, such condition of mind, as, by the law of the land, would render the prisoner irresponsible for his acts? There has been, and is still, a great variety of opinion entertained upon this subject, and especially among members of the medical profession who have written upon the subject of medical jurisprudence. Doubtless the subject has been much elucidated by the repeated discussions that have taken place. But, in Courts of justice where definite principles, and not mere theories, must be given practical application, and that too with a view to the safety of society, as well as for the protection of the particular individual accused, tests that have received the sanction of experience and the approval of the ablest jurists of our age, must be accepted and applied as the established law. And according to the law, as we find it settled by the great preponderance of judicial authority, if the party accused be competent to form and execute a criminal design; or, in other words, if at the time of the commission of the alleged offense, he had capacity and reason sufficient to enable him to distinguish between right and wrong, and understand the nature and consequences of his act, as applied to himself, he is a responsible agent, and amenable to the criminal law of the land for the consequences of his act. This is the leading test as applied by the Courts of England, and certainly by a very large majority of the Courts of this country.

In the very celebrated case of *McNaughten*, which occurred in 1843, the accused was indicted for shooting Mr. Drummond, the private secretary of Sir Robert Peel, the secretary being mistaken for Sir Robert himself. The party was defended, and acquitted, upon the theory of the existence of an insane delusion as to some imaginary persecution that he was suffering at the hands of Sir Robert Peel, whom he determined to kill.

The case excited great interest, and it occasioned a very earnest debate in the House of Lords, upon the state of the law of insanity, as applied in the administration of criminal justice. The opinion of all the Judges was taken, in the form of answers to certain questions propounded (10 *Cl. & Fin.*, 200); and, by that opinion, it was laid down as the settled law, and fully approved by the House of Lords, that notwithstanding a party may do an act, being in itself criminal, under the influence of an insane delusion, with a view of *redressing or revenging some supposed grievance, or injury,* or of promoting some public good, he is nevertheless punishable, if he had the capacity to distinguish between right and wrong, *and knew at the time that he was acting contrary to law.* Therefore, if the party accused be conscious that the act was one that he ought not to do, that act being contrary to law, he is punishable under the law. The law thus laid down furnishes the test in England, and it has been very generally accepted by the Courts in this country.

In 1844 the trial of *Rogers* took place in Massachusetts, for the murder of the warden of the prison where the accused was confined. This is a leading case in this country, and is reported in 7 *Metc.*, 500, but the facts are more fully reported in 1 *Lead. Cr. Cas.*, 87, by Bennett and Heard. The defence of the accused was that the act was committed under an insane delusion, that the warden intended to do him an injury that would result in his death. Chief Justice SHAW presided at the trial, and in a most carefully prepared charge delivered to the jury, he stated the test of criminal responsibility to be, that although the accused might be laboring under partial insanity, still, if he understood the nature and character of his act and its consequences; if he had knowledge that it was wrong and criminal, and mental power sufficient to apply that

knowledge to his own case, and to know that, by doing the act, he was doing wrong; such partial insanity was not sufficient to exempt him from criminal responsibility and punishment. And after stating the general principles applicable to such case, and referring to the facts, the learned Chief Justice put the inquiry: "Did this indicate such a *diseased state of mind*, that the act of killing the warden was to be considered as an outbreak or paroxysm of *disease*, which, for the time being, *overwhelmed and superseded reason and judgment*, so that the accused was not an accountable agent? If such was the case, the accused should be acquitted; otherwise, as the evidence proves beyond all doubt the fact of killing without provocation, by the use of a deadly weapon, and attended with circumstances of violence, cruelty, and barbarity, he must undoubtedly be convicted of *wilful murder.*"

In this case there is not the shadow of a pretence for contending that the prisoner, at the time of the act committed, was not able to distinguish as between right and wrong, or that he did not in fact know that the act was wrong and unlawful. Nor is there any evidence whatever of any delusion in reference to the victim of the prisoner's act. He boasted that he had the nerve to do the act, and his own evidence negatives the idea of any want of mental capacity to understand fully the nature and consequences of his act; and, with the fullest opportunity for explaining, he never for a moment pretended that he did not understand the full import of the act that he had done. But it is contended that there are other species of insanity than those referable alone to diseases of the mind, or disorders of the mental powers; that there is a species of insanity denominated by medico-legal writers as moral insanity, and sometimes as lesion of the will; and that such species of insanity may co-exist with ample mental

power and perception to distinguish right from wrong, and to understand fully the nature and consequences of criminal acts; and yet the party may be impelled to the doing of an act, wrong in itself, by a morbid irresistible impulse. This species of insanity, it is true, is recognized by many able writers upon medical jurisprudence; and by some few Courts it has had a partial or qualified recognition. But, by the great majority of Courts and jurists, it is, as an independent state or condition, declared to have no place in the law. All crime is committed from bad motives or impulses, and it is the great object of the law to compel people to resist and restrain their vicious criminal impulses; the law giving no impunity to their indulgence. *Taylor*, an author of high repute, in his work on *Medical Jurisprudence*, (*edition of* 1873,) *at page* 479, *of vol.* 2, says, " The intellectual disturbance may be sometimes difficult of detection; but in every case of true insanity it is more or less present, and it would be a highly dangerous practice to pronounce a person insane, when some evidence of its existence was not forthcoming. The law does not recognize moral insanity as an independent state; hence, however perverted the affections, moral feelings, or sentiments may be, a medical jurist must always look for some indications of disturbed reason. Medically speaking, there are, according to Dr. Prichard, two forms of insanity, moral and intellectual; but in law there is only one—that which affects the *mind*. Moral insanity is not admitted as a bar to responsibility for civil or criminal acts, except in so far as it may be accompanied by *intellectual* disturbance." And in speaking of moral or emotional insanity, as a defence for the commission of crime, the late Mr. Justice Curtis, in *U. S. vs. McGlue*, (1 *Curt.*, 1), well said: "It is an important as well as a deeply interesting study, and it finds its place in that science

which ministers to diseases of the mind.  *  *  *  *.
But the law is not a medical nor a metaphysical
science.    Its search is after those practical rules which
may be administered without inhumanity for the secu-
rity of civil society by protecting it from crime, and
therefore it inquires not into the peculiar constitution
of mind of the accused, or what weakness or even
disorders he was afflicted with, *but solely whether he was
capable of having, and did have, a criminal intent.*    If he
had such intent the law punishes him, but if not, it
holds him dispunishable."    This is a brief, but, as we
understand it, a clear and correct expression of the law
upon this very interesting subject.    And it seems to
be strictly in accordance with what was contemplated
by the Legislature, in the enactment of the provisions
of the Code, Art. 58, secs. 4 and 5, whereby it is pro-
vided, that when any person, indicted for crime, shall
allege insanity or lunacy in his defence, the jury shall
be required to find by their verdict whether such person
was at the time of the commission of the offence, or still
is, insane, lunatic or otherwise; and if the party be
found to be insane or a lunatic he is required to be
placed under restraint.

2. The proffered evidence not being admissible as
tending to show insanity of the prisoner *at the time of
the commission of the offence, nor at the time of the trial,*
the next question is, was it admissible to affect the
degree of the crime?    It is said that it tends to show
such condition of mind as to have rendered the prisoner
incapable of forming the wilful and premeditated pur-
pose of killing to constitute the case one of murder in
the first degree; and the case is attempted to be assimi-
lated to the case of a party committing a crime while
in a state of intoxication, where the question is, whether
he was in such a condition of mind as to be capable of
deliberate premeditation.    And in support of this con-

tention, the case of *Hopt vs. The People*, 104 *U. S.*, 631, and many other cases upon the same subject, have been pressed upon the attention of the Court. The principle of those cases may be conceded. But how does such principle apply to this case, where it is shown by all the evidence, that of the prisoner included, that there was the most deliberate premeditation in the perpetration of .the crime? that the victim of the crime was actually decoyed from his house to the place of the murder, and there, while defenceless, was admonished of the deadly purpose of his murderer, and then shot to death without resistance. Suppose the murder, instead of having been committed in the way it was, had been committed by preparing and administering poison, or by lying in wait, or while attempting to perpetrate the crime of rape, robbery, or arson, could it be seriously contended, upon the assumption that the prisoner had sufficient mind and capacity to make him criminally responsible for his acts, that such evidence as that embraced in the proffer should have been admitted for the purpose of reducing the degree of the crime? In such cases the antecedent conduct of the party would demonstrate the existence of the wilful and criminal purpose, and, upon the facts being found, the law has definitely declared the degree of the crime and fixed the penalty. And if in those cases such evidence would not be admissible, why should it be admissible in this? In those cases where intoxication is allowed to be shown to reflect upon the question of deliberation, the true end to be deduced from the authorities, says *Wharton*, (1 *Am. Cr. Law, sec.* 41,) is, "that when there is no evidence of premeditation *aliunde*, and where the defendant is proved at the time of the occurrence to have been in a state of mental confusion of which drink was the cause, the fact of such mental confusion may be received to show either that there was no specific intent to take

Spender *vs.* State.

life, or that there was no positive premeditation." And this principle is that recognized and adopted in the case of *Hopt vs. The People*, 104 *U. S.*, 633. Here the evidence shows most conclusively, not only the existence of positive premeditation, but that the accused was actuated by a *motive* of a rankling nature; and his preparation, and the pursuit of a plan of execution, betokened the determined purpose of a bloody and cruel revenge. The prisoner being criminally responsible, and having thus premeditated the killing, there is no principle that would justify the introduction of such evidence as that proffered, for the purpose of reducing the degree of his crime. The Court was therefore clearly right in excluding the evidence, and the rulings must be affirmed.

> *Rulings affirmed, and*
> *cause remanded.*

(Decided 18th April, 1888.)


*Per curiam.*—This case was submitted on brief by the Attorney-General, and, in addition to quite a full brief on behalf of the appellant, there was an oral argument at bar in support of the appeal, before all the Judges, except Judge McSherry. He has, however, at our request, carefully examined the case, and he fully concurs with the majority of the Court in the foregoing opinion.

Bryan, J., delivered the following dissenting opinion in which Yellott, J., concurred:

Spencer was indicted for murder. The homicide was fully proved; the prisoner himself testifying to it, when offered as a witness in his own behalf. It appeared that the deceased, Scott Dawson, about nine years before the homicide, had been convicted of an assault on

Rachel Dawson with intent to commit a rape, and had been sentenced to five years confinement in the penitentiary, and that while Dawson was in the penitentiary, the prisoner had married Rachel, who died about three years before this trial. The prisoner testified that he killed Dawson, because of this assault on the woman whom he had afterwards married. An offer of testimony was then made which we state in the words of the record:

"The prisoner's counsel then proffered to prove by the witness, in his own behalf, the following statement of facts, as follows, to wit:

"To prove by himself that in July, 1884, his wife died, and that previous to her death she had frequently complained to him of illness, the cause of which she attributed to a felonious assault made upon her by the deceased; that the traverser believed the said assault was the immediate cause of her death, and that this fact fastened itself upon his mind to the exclusion of all other thoughts; that from the death of his wife to the date of the homicide, he was nervous and restless, and that it was impossible for him to remain long at one employment by reason of this condition; that the dead body of his wife, with the scars inflicted by the deceased, would appear to him in his dreams, and he was constantly followed and haunted by the idea, that so long as the deceased lived, he, the traverser, would have no rest or peace of mind, and that he could exercise no power of will or self-control over this idea, and that since the death of Dawson, the traverser has found rest, and peace, and quiet."

"To which the State objected. The Court rules the whole proffer inadmissible, unless the prisoner would assure the Court that he would follow it up by proof, tending to show that at the time of the shooting he was insane or deranged, and thereby irresponsible for

his acts; which assurance the prisoner's counsel refused to give the Court; whereupon the Court ruled said testimony and each and every part of it inadmissible, and excluded it from the jury."

The prisoner excepted to the ruling of the Court, and having been convicted of murder in the first degree, he appealed to this Court.

There cannot be the least question that at one period of the law's history the facts mentioned in the offer of testimony would have been inadmissible. But a considerable change on the side of mercy has taken place in the administration of criminal justice. Legislation mitigating the punishment in certain descriptions of murder; and permitting persons accused of crimes to testify in their own behalf has been partly the cause, and partly the consequence of this change. Malice has always been the essential ingredient in murder; but in determining its existence, the jury are now allowed to hear evidence which at one time was peremptorily excluded from their consideration. *Blackstone* tells us: "Express malice is when one, with a sedate, deliberate mind and formed design doth kill another: which formed design is evidenced by external circumstances discovering that inward intention; as laying in wait, antecedent menaces, former grudges, and concerted schemes to do him bodily harm." *Book* 4, *page* 199. And it was held also that the law conclusively implied malice, when a person intentionally killed another without a legal provocation. The question of malice was settled by the facts attending the homicide. And no further investigation was permitted of the condition of mind, under which the accused struck the fatal blow; unless it tended to show that he was incapable of committing crime by reason of lunacy or infancy. But in all systems of law which have established degrees in the crime of murder, and have assigned wilful, delib-

erate and premeditated killing to the first degree, there has been a considerable modification of this rule of evidence. The Supreme Court of the United States have given their approval to this change. In *Hopt vs. People*, 104 *U. S.*, 631, a writ of error from the Territory of Utah, where the distinction in the degrees of murder is established by statute, it is said: "At common law, indeed, as a general rule, voluntary intoxication affords no excuse, justification, or extenuation of a crime committed under its influence. *United States vs. Drew*, 5 *Mason*, 28; *United States vs. McGlue*, 1 *Curt.*, 1; *Commonwealth vs. Hawkins*, 3 *Gray*, (*Mass.*,) 463; *People vs. Rogers*, 18 *N. Y.*, 9. But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness or *otherwise*, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury." In the Circuit Court of the United States for the District of Maryland, on the trial of Peter Creamer, for murder, the same inquiry was submitted to the jury; although the Statutes of the United States do not make any distinction between the different degrees of murder. In this case Chief Justice TANEY gave this instruction to the jury:

"If the state of mind in which the prisoner committed the homicide was produced by drinking intoxicating drinks, his drunkenness is no excuse for the act. But his state of mind may be considered by the jury in determining whether there was malice or not, and whether the killing was manslaughter or murder."

A still further change has resulted as a consequence from the statute which allows defendants in criminal cases to testify for themselves. Parties are allowed to prove their intentions by their own testimony; whereas

formerly, it was necessary to prove by the accompanying circumstances the intent with which an act was done. A man's mental and bodily feelings, the thoughts and intents of his heart, his emotions and mental operations are better known to himself, than to any other person; and if he will truthfully state them; their condition will be more clearly disclosed, than it would be possible to do by an exhibition of external facts and circumstances. Although in testifying for himself, he may be under the strongest possible temptation to depart from the truth; as the law has made him a competent witness, it is not in the power of the Courts to deny him the right of testifying. He must be allowed to bear testimony to that which he doth know; and it must be left to the intelligence and integrity of the jury to determine whether they will believe him. And so it has been held in this Court, and in other Courts, that where a party is allowed to be a witness for himself, he may state in evidence his own secret, undisclosed intentions connected with the commission of an act by himself. *Fisk vs. Inhabitants of Chester*, 8 *Gray*, 508; *Roddy vs. Finnegan*, 43 *Md.*, 501; *Fenwick vs. State*, 63 *Md.*, 239. If the prisoner's mind was agitated in the manner described in the offer of testimony, and his power of will and self-control were overthrown in reference to the idea connected with the death of the deceased; these facts were pertinent to the inquiry, whether he had that sedate deliberate mind which Blackstone declares to be essential to malice. They do not show that he was lunatic or insane, and would not make out a case of irresponsibility for crime. But they are of considerable importance in revealing the condition of the prisoner's mind, and of illustrating the question whether he was capable of controlling the violence of his emotions so as to form an intelligent resolution.

If from mental disease or from feebleness of intellect a person has not sufficient power of self-control to govern his actions, it would be inhuman and unreasonable to hold him to criminal responsibility. If, on the other hand, his mind is rational and sound, and he commits acts of violence while under the dominion of turbulent and malignant passions, he is justly liable to the uttermost penalties of the law. But between these extreme limits, many intermediate cases may exist. The mind may be so enfeebled, and the power of the will so weakened, that the man may be overpowered by temptation too strong for him to resist; and he may act under its influence without having the "sedate, deliberate mind and formed design" which are essential to express malice. If the state of mind of an accused person is such that he was not capable of deliberation when he committed a homicide, it cannot make any possible difference from what cause the incapacity may arise. The inquiry is by no means restricted to drunkenness. Let me quote authorities of high repute: In *Johnson's Case*, 40 *Conn.*, 136, it was said: "Implied malice is sufficient at common law to make the offence murder, and under our statute, to make it murder in the second degree; but to constitute murder in the first degree, actual malice must be proved. Upon this question the state of the prisoner's mind is material. In behalf of the defence, insanity, intoxication, *or any other fact* which tends to prove that the prisoner was incapable of deliberation, was competent for the jury to weigh." In *Jones vs. Commonwealth*, 75 *Penn.*, 403, we find this language: "Want of intelligence, therefore, is not the only defect to moderate the degree of the offence; but with intelligence there may be an absence of power to determine properly the true nature and character of the act, its effect upon the subject, and the true responsibility of the actor; a power necessary to control the

impulses of the mind, and prevent the execution of the thought which possesses it. In other words, it is the absence of that self-determining power, which in a sane mind renders it conscious of the real nature of its own purpose, and capable of resisting wrong impulses. When this self-governing power is wanting, whether it is caused by insanity, gross intoxication, *or other controlling influence*, it cannot be said truthfully that the mind is fully conscious of its own purposes, and deliberates or premeditates in the sense of the act describing murder in the first degree."

In *Pigman vs. State*, 14 *Ohio*, 555, it was held that where "the degree of guilt depends upon the calm and deliberate state of the mind at the time of the commission of the act, it is proper to show any state or condition of the person that is adverse to the proper exercise of the mind, and the undisturbed possession of the faculties. * * * * Hence drunkenness, *as anything else, showing the state of mind, or degree of knowledge*, should go to the jury." These cases were cited and approved by the Supreme Court of the United States in *Hopt's Case*, where it was held to be a material subject of consideration by the jury, whether the accused was in such a condition of mind by reason of drunkenness, or *otherwise*, as to be capable of deliberate premeditation. And there is no lack of other high authorities to the same effect. In *Dejarnette vs. Comm.*, 75 *Va.*, 880, the Court said: "there are, doubtless, cases in which, whilst the prisoner may not be insane, in the sense which exempts from punishment, yet he may be in that condition from partial aberration or enfeeblement of intellect which renders him incapable of the sedate, deliberate, and specific intent necessary to constitute murder in the first degree. These are questions for the jury, and not for the Court."

In *Jones vs. State*, 29 *Ga.*, 594, we read: "It is too apparent to need argument, that when the act is shown, the mental constituent of the crime still remains to be investigated, and in this investigation there can be no rational discrimination made between the light which may be shed upon it by drunkenness, *and that which may be shed by any other fact in the world.*" Other citations would be superfluous.

It is true that the proposed evidence is in conflict with other testimony in the cause. But this cannot be a reason for rejecting it. The whole theory of trials by jury, proceeds on the assumption, justified by universal experience, that there will very frequently be irreconcilable contradictions in the testimony. Nor would it be proper to exclude the evidence, because it was apprehended that the jury might draw from it such conclusions as the Court might consider illegitimate. It must never be forgotten that in this State, the jury are judges of the law in criminal cases; and the Court cannot, without a great usurpation of power, attempt to limit or control them in the exercise of their constitutional functions. It is indispensable to the efficient and intelligent discharge of their duties, that the case should be fully exhibited to them by the evidence.

I have felt considerable doubt concerning the admission of this testimony. But as the entire question of guilt or innocence is committed to the finding of the jury, and as malice is the indispensable element of the crime of murder, I have considered it more in accordance with the humane spirit of the law, to leave this inquiry as free as it can reasonably be made, so that upon a view of every fact and circumstance connected with the transaction, the jury may render such a verdict as under a solemn sense of their responsibility, they may believe to be just and true. In this way at least substantial justice will be administered.

As to the second exception it is sufficient to say, that the question proposed was too vague and indefinite to be permitted. It did not point to any connection between the prisoner's mental condition and the homicide.

