## DUNN v. STATE

[No. 2, September Term, 1961.]

464

466

*Decided October 13, 1961.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Leonard H. Lockhart* and *Charles M. Huester* for the appellant.

*William J. McCarthy, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *J. Albert Roney, Jr., State's Attorney for Cecil County,* on the brief, for the appellee.

SYBERT, J., delivered the opinion of the Court.

The fact that Harry Edward Dunn, Jr., appellant, killed

his wife and 18-month-old daughter in the early morning of September 3, 1958, is not disputed. He was tried in the case involving his wife, convicted of murder in the first degree, and sentenced to death. The basic questions raised on this appeal are whether he was legally sane at the time of the commission of the offense, and, if so, whether it amounted to first degree murder.

The circumstances of this tragedy had their setting in a rented farm house in Cecil County in which Dunn had been living with his wife and five children while stationed with the United States Navy at Bainbridge Naval Training Station, where he served as Assistant Chief Master at Arms in the galley. The record shows that the marriage between Dunn and his wife in 1949 had followed an alleged feigned pregnancy, and that their life together was not one of complete harmony. Dunn admitted that after the marriage he frequented houses of prostitution while on liberty in various ports. He testified that in June, 1957, when their fifth child was born, he "had relationship" with the woman acting as baby sitter while his wife was in the hospital. (In several of his psychiatric interviews before the trial he stated he attempted such intercourse but found he was impotent.) In February, 1958, he moved out of his house and slept in quarters made available to him on the base. He gave as his reasons his frequent arguments with his wife, particularly in regard to the matter of a divorce to which he said she refused to consent, and also what he described as her slovenly housekeeping habits and lack of concern with her appearance and that of their children. He testified that he would visit his family on weekends but denied any further marital relationship with his wife.

In May, 1958, Dunn met Virginia Hargrove, a WAVE reservist, while she was taking two-week reserve training at Bainbridge. Both Dunn and Miss Hargrove testified that they became intimate after Miss Hargrove had returned to Ithaca, New York, where she was employed. The couple discussed marriage—Dunn never informing Miss Hargrove that he was already married. He managed to put off the date of the marriage with the excuse that he had first to sell his

farm—although he actually owned no farm. Meanwhile his continued efforts to get his wife to agree to a divorce were unsuccessful. He did not disclose to Mrs. Dunn his relationship with Miss Hargrove.

In mid-July Dunn notified his landlord, Sam Plummer, that he was planning to move his family in September to a furnished house he had purchased in Norfolk, Virginia. Subsequently, his wife began selling their furniture piecemeal in anticipation of this move, set for September 3. Actually, Dunn had not purchased a house in Virginia.

On September 2, the day before the supposed move, Dunn, after spending the morning discing a field for his landlord, went to the town of North East to cash an allotment check for his wife. While buying gas at a station, he also purchased a shovel and placed it in the trunk of his car, and admitted at the trial that he told his son who had accompanied him not to tell Mrs. Dunn of this. Dunn returned home, did some additional tasks on the landlord's farm, and while there informed a neighbor he was leaving for Norfolk around midnight. He discouraged his neighbor's offer to visit the Dunns that night in order to see them off.

After resting at home in the early evening Dunn left the house about 10:30 P.M. with the announced purpose of returning to the base in order to make arrangements regarding time off for the move to Virginia. Instead, he stopped at a diner, drank several cups of coffee, and then left to return home about 11:40 with the purpose of talking to his wife about "this divorce and the filthiness and all." However, his demands for a divorce were again refused by his wife, and he testified that she laughed at him and suggested he see a doctor, at which point Dunn bludgeoned his wife to death with an automobile jack handle which he had been holding in his hand during the conversation. His 18 month-old daughter in a nearby room began to cry, and after picking up the baby, he then also killed the child with the same instrument. Using the shovel he had purchased the day before, Dunn dug a shallow grave in the field he had disced and placed the bodies therein. He then covered the bodies with quilts, and as he later explained in his statement to the State's Attorney for

Cecil County, he did this because "I felt that I didn't want them to get cold."

Dunn left a note for his landlord and then drove to New York City, after giving up an intention to commit suicide in the car. After taking a hotel room in New York he did make an unsuccessful attempt to take his own life and was taken into custody by New York police. He made two statements amounting to a confession to a New York detective and another to the Maryland authorities upon his return to this State.

At the request of his counsel Dunn was committed by the court to Spring Grove State Hospital, following his arraignment on September 29, 1958, for determination of his mental status. Dr. Isadore Tuerk, then Superintendent of the hospital, testified that after a number of interviews with Dunn, his staff had "a great deal of difficulty in arriving at a decision" concerning the mental condition of the accused, and that "there was uncertainty about him". The first staff conference concerning Dunn was held at the hospital on March 10, 1959, almost six months after the defendant had been committed to the institution. After interrogation of Dunn at the conference, certain members of the staff concluded that he was insane under the rule followed in Maryland. However, Dr. Jacob Morgenstern, then Director of Correctional Psychiatry for the Department of Mental Hygiene, who was present at the staff conference, disagreed with this conclusion. It was his opinion at that time that Dunn was not psychotic and could distinguish right from wrong both then and at the time of the offense, and he testified that this opinion "was shared by one of the highly qualified psychiatrists and some of the members [of the staff] who were not qualified" to practice psychiatry.

Several days later Dr. Tuerk reviewed Dunn's hospital records, examined him and concluded that he was "mentally ill and suffered from schizophrenia". Apparently due to the conflict, Dr. Tuerk requested an opinion from Dr. Manfred Guttmacher, Chief Medical Officer to the Supreme Bench of Baltimore City. Dr. Guttmacher first had his assistant, Dr. Ainsworth, a psychologist, examine Dunn. On the

basis of Dr. Ainsworth's report to him, and his own examination of Dunn, Dr. Guttmacher concluded that the accused was suffering from paranoid schizophrenia both then and at the time of the homicides.

Dunn remained at Spring Grove until January 19, 1960, when he was transferred for a four month period to Bethesda Naval Medical Center for observation and treatment pending possible discharge from the Navy. After extensive review of his case, the staff psychiatrists of this institution concluded that Dunn was not psychotic at that time. Their diagnosis was "Emotional Instability Reaction, Severe", which was described as a personality disorder and not a mental disease. Whether he had in the past suffered psychotic episodes was not made clear enough in the tests at the naval hospital to warrant a positive statement one way or the other, the report stated.

Some two months after his return to Spring Grove, on July 12, 1960, Dunn was transferred to Clifton T. Perkins State Hospital, the reason being the discontinuance of the maximum security section at Spring Grove. Dr. Morgenstern had meanwhile become Superintendent of Perkins Hospital and as part of the ordinary admittance procedure, Dunn was presented to the staff for evaluation. The determination was that Dunn was not psychotic at that time, nor on September 3, 1958, the date of the offense.

Dunn was therefore reported to the court by Dr. Morgenstern in September, 1960, as capable of standing trial and as having been sane at the time of the homicides. He was subsequently tried for the murder of his wife in the Circuit Court for Cecil County before a three judge court, sitting without a jury. He pleaded not guilty and not guilty by reason of insanity at the time of the commission of the alleged crime. At the conclusion of the trial the verdict was that appellant was sane at the time of the commission of the crime "beyond any reasonable doubt", and was guilty of murder in the first degree. On the same day, he was sentenced to death.

In his appeal from the judgment and sentence of the trial court, appellant's principal challenge is on the finding of sanity at the time of the homicides. However, he also raised

the following contentions: (2) that he was insane during the trial of the case and incompetent to defend himself; (3) that he has been denied due process of law in violation of both the Federal and State Constitutions by being forced to stand trial while insane; (4) that he was not guilty of murder in the first degree; (5) that the record of the Clifton T. Perkins Hospital should not have been admitted into evidence; (6) that Dr. Morgenstern should not have been allowed to read into evidence a lengthy statement contained in the record of the hospital as to reasons why he thought the appellant was not insane; and (7) that the trial court should not have allowed the introduction into evidence of the written statements amounting to a confession by the accused to a detective in New York.

(1)

Counsel for appellant have argued with admirable sincerity, vigor and diligence in seeking to establish the defense of insanity on behalf of their client, a defense which was denied by the trial court on the basis of the evidence presented to it, including the extremely thorough, though conflicting, testimony of five doctors widely experienced in the field of psychiatry. In evaluating this difficult decision which the trial court made and the ultimate verdict of guilty, we, of course, will not set aside the finding below on the evidence unless that decision was clearly erroneous. *Doyal v. State,* 226 Md. 31, 171 A. 2d 470 (1961); *Saldiveri v. State,* 217 Md. 412, 143 A. 2d 70 (1958); Maryland Rule 741 c. This rule will be applied where the question of a defendant's sanity is the issue. *Saldiveri v. State, supra.* How much weight is to be given to the evidence presented and how great a degree of credibility is to be assigned to the witnesses are questions primarily for the trier of facts to determine, and if it is convinced of guilt beyond a reasonable doubt by sufficient evidence, and the reasonable inferences to be drawn therefrom, this Court need not be so convinced in order to sustain the conviction. *Brown v. State,* 222 Md. 312, 160 A. 2d 95 (1960); *Doyal v. State, supra.* In the instant case, we find no basis upon which to conclude that the decision of the trial court was clearly in error.

It was the function of the trial court to evaluate the evidence as to the defendant's sanity. Drs. Tuerk, Guttmacher and Ainsworth were called to testify by the defense. Drs. Morgenstern and Spaulding (the latter being the psychiatrist at the Bethesda Naval Medical Center) were produced by the State. The first three gave it as their opinion that Dunn was suffering from paranoid schizophrenia, a psychosis described as consisting of feelings of persecution and a loss of contact with reality, as well as disturbances in thinking, feeling and behaving, an illness often associated with delusional elaborations. Under such a diagnosis, they felt Dunn could not be held legally responsible for the acts he committed under the M'Naghten rule, adopted as applying in this State in *Spencer v. State,* 69 Md. 28, 13 Atl. 809 (1888), and followed ever since. Under that rule the defendant is presumed to be sane if, at the time of the commission of the alleged offense, he has capacity and reason sufficient to enable him to distinguish between right and wrong and understand the nature and consequences of his act as applied to himself. Pointed to as one of the factors supporting the diagnosis of insanity was Dunn's alleged excessive preoccupation with cleanliness, an obsession which, in the opinion of Dr. Tuerk, he elaborated into psychotic proportions. Dunn's aversion to filth was given great weight by the defense in explaining his reasons for killing his wife—that she above all others represented to him all that was dirty and evil in the world. It also was argued strenuously that Dr. Morgenstern, who reported to the court that Dunn was sane at the time of the crime, had made his finding 22 months after the homicides when the accused was transferred to Clifton T. Perkins Hospital, of which Dr. Morgenstern had become Superintendent; that his only prior acquaintance with the defendant was during his attendance at the initial evaluation of Dunn at Spring Grove, six months after the killings.

To counter this defense effort was the opinion of the staff of Perkins Hospital and the testimony of Dr. Morgenstern, as well as that of Dr. Spaulding, who had personally observed and treated Dunn during his whole stay at the Bethesda Naval Medical Center. Their view was that Dunn was not

psychotic at the time of examination, nor at the time of the offense, but rather suffered from a personality disorder labeled as "passive, aggressive personality" by Dr. Morgenstern, and as "Emotional Instability Reaction, Severe", by Dr. Spaulding. In the opinion of Dr. Morgenstern, Dunn was legally responsible under the *Spencer* test for the killings. A factor emphasized by the State was the fact that Dr. Morgenstern, while he did not make his final determination until 22 months after the offense, had been present at the initial evaluation of Dunn by the staff at Spring Grove six months after his commitment, and had then definitely expressed his belief that the defendant was not psychotic and was therefore legally responsible, and his view was shared by several other physicians at that conference.

In its assessment of the weight to be accorded the testimony of the psychiatrists the trial court may have found Dr. Spaulding's testimony as to Dunn's mental status particularly impressive in that of all the physicians who testified, Dr. Spaulding had spent by far the greatest amount of time with the accused during his stay at the naval hospital, twenty-three individual hour-long interviews between January 20, 1960 and March 31, 1960. Although the staff report from that hospital did not commit itself as to Dunn's mental status on the day of the homicides, Dr. Spaulding himself testified that in his opinion Dunn was not psychotic on the fatal morning; that had he been suffering from paranoid schizophrenia on that date, September 3, 1958, evidence of such disease would still be apparent when Dunn was first examined by him in January of 1960. Dr. Spaulding found no such evidence of any preexisting psychosis at any time during the intensive observation and treatment of Dunn. His opinion that some detectable residual of schizophrenia would be present if in fact Dunn had ever suffered this disease was affirmed emphatically by Dr. Morgenstern, who testified that "A serious disorder of schizophrenia, paranoid type, which would make such a person irresponsible for the crime committed, would have to be, by all means, detectable even after two years. It could not be completely obliterated even by a time element of seven, nine months or two years."

As to Dunn's alleged obsession in regard to dirt and filth, Dr. Spaulding attributed a great deal of this to what is referred to as iatrogenic influence, that is, an unavoidable effect that often results from psychiatric treatment, in which a patient will build up a theory in his own mind as to what is his basic problem, perhaps on the basis of what a doctor has inadvertently said or what he has heard from someone else in his environment. As to this explanation by Dr. Spaulding, Dr. Morgenstern stated, "I am one hundred per cent sure he is right about it. I know it." In support of this theory Dr. Spaulding testified, and the staff report of the naval hospital specified, that "At no time while in this hospital, was the patient observed to be or show any indication of obsessive-compulsive behavior or abnormal preoccupation with dirt." In addition, Dunn's immediate supervisor in the Navy testified that in his opinion the appellant had not seemed more concerned about the cleanliness of the galley than any other petty officer.

A further factor entitled to consideration was the weakening of Dr. Tuerk's testimony on cross-examination. It was brought out that Dr. Tuerk's opinion had been formed as to Dunn's insanity without knowledge of the note which he had left for his landlord after the killings. The note read:

> "I am sorry. She wouldn't give me a divorce. I am not a killer. I guess I couldn't finish. Betty and Joanne are in the field I disced.
> "This car belonged to this person." (Dunn left the registration card of the car with the note.)

The possible effect of this note in Dr. Tuerk's opinion was to show regret on the part of Dunn for his acts, an indication, he admitted, that appellant was thinking and reasoning. Dr. Tuerk also testified as to his lack of knowledge of the statements given by Dunn to the detective in New York. These factors, he admitted, would have adversely affected his degree of conviction as to his diagnosis of Dunn.

In criminal cases involving mental status the trier of facts does not apply a medical definition of insanity. Rather, the concern is whether the mental quality of the defendant ex-

isting at the time of the commission of the crime, as it can best be discerned from the evidence available, was such as to relieve him from legal responsibility as it is defined in this State. It is the obvious objective of the M'Naghten rule to exempt from responsibility not one who is simply mentally ill, but who, in the commission of an act against society, clearly did so while lacking sufficient mental capacity to "enable him to distinguish between right and wrong, and understand the nature and consequences of his act as applied to himself". *Saldiveri v. State,* 217 Md. 412, 422, 143 A. 2d 70 (1958). The rule is firmly imbedded in Maryland law. We conclude that the trial court had before it sufficient evidence upon which, together with all proper inferences therefrom, it could reasonably find that appellant was legally sane when he committed the offense here charged, and therefore its finding in this respect cannot be said to be clearly erroneous.

A question was raised in the briefs and oral argument as to which party had the burden of proof on the insanity issue in this case. This matter was discussed by Chief Judge Brune in *Lipscomb v. State,* 223 Md. 599, 165 A. 2d 918 (1960), and by Judge Horney in *Saldiveri v. State, supra,* but since there was insufficient evidence in those cases that the defendants were insane, the question was not reached. We do not reach it here, because the trial court applied the stricter standard by imposing upon the State the burden of proving sanity beyond a reasonable doubt, which it specifically found had been met.

## (2) and (3)

The question of Dunn's insanity at the time of trial, and his claim of denial of due process by being subjected to such trial while insane, were not pressed at oral argument and have no foundation when the evidence is considered. All the psychiatrists, those called by the defense as well as those produced by the State, testified that in their opinion Dunn was at the time of trial sane, responsible and mentally capable of participating in his own defense, and there was no evidence to the contrary.

## (4)

Appellant contends that even if he was sane, he was not guilty of murder in the first degree; that the facts in the rec-

ord show no more than a case of manslaughter or at the very worst, murder in the second degree.

Code (1957), Art. 27, § 407, states:

> "All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."

In our view there was evidence before the trial judges which, if believed, was sufficient to convince them that Dunn did have a wilful design to murder, that the element of deliberation, a full and conscious knowledge of the purpose to kill, was present in his mind, and that there was an appreciable length of time before the killing in which Dunn could reflect on the act he was about to commit, and make a deliberate choice to kill or not to kill. *Brown v. State*, 220 Md. 29, 150 A. 2d 895 (1959); *Elliott v. State*, 215 Md. 152, 137 A. 2d 130 (1957). The existence of deliberation and premeditation must be judged from the facts of the particular case. *Kier v. State*, 216 Md. 513, 140 A. 2d 896 (1958).

In the instant case the facts clearly reveal sufficient motivation on Dunn's part for the murder of his wife. She had consistently refused to consent to a divorce and at that time he was seriously involved with Virginia Hargrove in New York, with whom he had been intimate, and the couple had actually set a tentative marriage date, she not knowing he was already married. Dunn had in addition convinced a number of people, including his family, that he had purchased a furnished house in Norfolk, and his furniture had been sold. He had carried off this deception up to the very eve of the supposed move. In addition there was the matter of the purchase of a shovel the day before the crime, the discouraging by Dunn of a visit by his neighbors to see the family off to Norfolk, and the taking of the jack handle into the bedroom for the final interview with his wife. For an hour and a half before the murders Dunn had time to consider the fact that "I was in a squeeze", as he stated in his confession to the Maryland authorities. There was ample evidence of purpose and design to kill, and Dunn's own words in his Maryland

confession show elements of premeditation and deliberation in the moments before the act itself:

> "* * * When I asked her for a divorce she said that she would never give me one. When she said that, I got mad and *I had the iron bar in my hand,* I kept gripping it harder and got nervous. *I wanted to hit her and I couldn't because I knew it was wrong for me to do it.* The next thing I knew I don't know how many times I had hit her. * * *" (Emphasis supplied.)

As this Court stated in *Faulcon v. State,* 211 Md. 249, 258, 126 A. 2d 858 (1956), "If the killing is not the instant effect of impulse, if there is *hesitation* or *doubt to be overcome, a choice made as a result of thought,* however short the struggle between the intention and the act, the crime is sufficient to be characterized as deliberate and premeditated murder." (Emphasis supplied.) Appellant's state of mind at the time of the act meets the test of deliberation and premeditation as set out in that case.

Appellant claims that the testimony of Dr. Morgenstern himself showed that appellant could not be guilty of first degree murder because the doctor testified at one point that he felt Dunn had probably gone into a rage before the killing, which the appellant argues negated premeditation. However, even if we assume, without deciding, that a person's temper has some bearing on premeditation, Dr. Morgenstern later in his testimony cleared up his views in this regard when he testified, "I say at the time he hit his wife; if I didn't say it, I say it now; he knew what he was doing. * * * He doesn't control himself. He has the capability but he doesn't use the capability."

We think there was sufficient evidence before the trial court to support its finding of murder in the first degree.

## (5) and (6)

The appellant claims it was error to admit Dunn's record from Clifton T. Perkins Hospital into evidence, and to allow Dr. Morgenstern to read into evidence the lengthy statement

contained in the record of the hospital as to reasons why he thought the appellant was not insane. The grounds are that the record constituted hearsay, that the record was irrelevant because it was made two years after the commission of the crime and that it contained material that was reported by unqualified persons who would not be allowed to give their opinion if they were present before the court.

As to the hearsay objection, hospital records are admitted under our statute, Code (1957), Art. 35, § 59, as records made in the ordinary course of business. *Old v. Cooney Detective Agency,* 215 Md. 517, 138 A. 2d 889 (1958). The statute is applicable in criminal cases. *Jones v. State,* 205 Md. 528, 109 A. 2d 732 (1954). While specific portions of the record are open to objection under certain circumstances, *Yellow Cab Co. v. Hicks,* 224 Md. 563, 168 A. 2d 501 (1961), we fail to see any merit in the contentions raised here by appellant. The issues in this case would indicate the relevancy of the hospital record in determining Dunn's mental status, a matter which by its nature must be subjected to continuous study and investigation. Furthermore, as to the qualifications of those who entered notations in the record, Dr. Morgenstern was thoroughly cross-examined on this matter and his testimony clearly shows that each of those concerned with the record was qualified to enter in the record whatever his contribution may have been. We find no error in these rulings.

## (7)

Appellant's final contention is that the trial court erred in allowing into evidence, over objection, the written statements, amounting to a confession, given on two separate occasions by the appellant to Detective O'Sullivan of the New York police force, the first while Dunn was recovering from his suicide attempt in a New York hospital, and the other at the police station after his release from the hospital. The objection was made on the ground that after the statements were reduced to writing the accused did not have sufficient time to read them before signing them. This contention is without merit. It was refuted by the uncontradicted testimony of the detective, which showed that the defendant was given

ample time to read the statements before signing them—at least a half hour.

Having found no error below, the judgment will be affirmed.

*Judgment affirmed.*