# EDWARD C. WATTS *vs.* THE STATE OF MARYLAND

*Changing Name in Indictment Without Consent of Grand Jury—Admissibility of Prisoner's Confession—Burden of Proof—Competency of Evidence as to Sanity.*

An indictment as returned by the grand jury, in the first count charged the defendant with the murder of Caroline W; in the second count it charged the murder of Katharine C. W. Afterwards, the State's Attorney with the leave of the Court, but without the knowledge of the grand jury, which had adjourned, amended the first count by inserting the name Catharine in lieu of Caroline. This amendment did not appear upon the face of the indictment. *Held*, that the demurrer to the indictment on this ground was properly overruled.

*Held*, further, that a motion to quash the whole indictment for the same reason was properly overruled, because, although the amendment was unauthorized, yet it vitiated only the first count, and the second count remained valid and sufficient to sustain a verdict of guilty if otherwise justified.

The name of a person in an indictment is a matter of substance which cannot be changed without the consent of the grand jury and the Christian as well as the surname is within this rule. Under Code, Art. 27, sec. 284, the amendment of an indictment wherein there is a misnomer of a person other than the defendant is authorized to be made according to the proof in the case and after a jury has been sworn.

When the defendant's confession is offered in evidence against him on the trial of an indictment the burden of showing affirmatively that it was not obtained from him by improper means is upon the prosecutor.

Shortly after the arrest of the defendant for the killing of his wife and on the day of the homicide, a newspaper reporter found him in a nervous condition, covered with blood from the wound on the side of his head, and apparently suffering from shock. The reporter told him that it would probably be better for him if he would make a clean statement of the affair. *Held*, that a confession thus obtained was not admissible, since it is not shown to have been freely and voluntarily made.

When the question was as to the sanity of the defendant a witness testified that he had known the accused for fifteen years and had seen him frequently; that he was a man of eccentric ways, and would tell, if he had money, how he would turn it into millions; that he had a great many imaginary ideas, that he would fuss with his wife; that some_ times when he met witness, he would say, "hello, Andy," and some_

times, "how are you Mr. Hamilton?" *Held*, that the opinion of this witness as to the sanity of the prisoner is not admissible because based upon frivolous and inconclusive reasons.

A witness testified that he had met the defendant four or five times a day for two or three recent years and had frequently noticed his strange and peculiar conversation and behavior; that he could not talk contin. uously upon any subject; that he held his head down while talking, sometimes with his eyes rolling, that while on duty as a park police- man he sometimes played with children, crawling on his hands and knees arid sometimes patting sand and water. *Held*, that the opinion of this witness as to the defendant's sanity is competent evidence.

When direct evidence of the insanity of the defendant has been offered, it is competent to prove that insanity existed in his family.

A non-expert witness is not authorized to testify as to his opinion of a party's sanity unless he has had adequate opportunities for observing that party aud the facts upon which his opinion is founded are such as would enable a rational mind to draw a conclusion.

When a long hypothetical question is put to an expert in insanity, who answers that upon the facts stated he could not say either that the per· son described was sane or insane, no reversible error results from the allowance of the question, even if open to objection.

An expert witness is not to be discredited as such by showing that the rulings on questions put to him at the trial of another case had been re- versed on appeal, or that a person whom he had once pronounced to be insane had subsequently recovered his reason.

The mere fact that the defendant's family physician had never heard that he was insane is not competent evidence.

Appeal from the Circuit Court for Harford County (WAT-TERS, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*John S. Young* and *Howard Bryant*, for the appellant.

*William S. Bryan, Jr., Attorney-General,* for the appellee.

PEARCE, J., delivered the opinion of the Court.

The appellant was indicted in the Circuit Court for Balti- more County for the murder of his wife, and the case being removed for trial to the Circuit Court for Harford County, he

was there convicted of murder in the first degree, and sentenced to death. During the course of the trial, fifteen exceptions were taken.

The first exception was taken to the overruling of a demurrer to the indictment, and the subsequent refusal to quash the indictment, because of an amendment thereto which it is alleged rendered it void.

The second, third and seventh exceptions were taken to the admission of a confession made by the defendant.

The fourth, fifth, sixth, eighth, and ninth exceptions were taken to the refusal to allow non-expert witnesses to give their opinion of defendant's sanity after stating the facts upon which these opinions were based.

The tenth, twelfth, thirteenth and fifteenth exceptions relate to the allowance of certain hypothetical questions put by the State to several physicians to test their opinion of defendant's sanity.

The eleventh exception was taken to the cross-examination of Dr. Hill in reference to his testimony as an expert in the Berry Will case, and also in the case of a man named Klein, indicted for murder.

The fourteenth exception was taken to a ruling allowing the defendant's family physician to state·that he had never heard any intimation that defendant was not mentally sound.

These exceptions will be considered as they have been grouped.

The presentment charged the defendant with the murder of Caroline Watts. The indictment as returned by the grand jury, and as filed by the Clerk of the Court, in the *first count* followed the presentment, and charged the murder of Caroline Watts, though in the *second count* it charged the murder of Katherine C. Watts. It is admitted by the State that after the adjournment of the grand jury; the State's Attorney for Baltimore County, with the leave of the Court, but without the knowledge or assent of the grand jury, amended the first count of the indictment by striking out the name "Caroline," and inserting in its place, the name, "Katherine C." It

appears from the record that the amendment did not appear upon the face of the indictment, and the demurrer was therefore properly overruled.

The motion to quash the indictment went to both counts, and in the first paragraph of the motion it was alleged *generally* that the State's Attorney changed the name "Caroline Watts" in the indictment returned, to "Katherine C. Watts" as it appeared in the record transmitted to the Circuit Court for Harford County, which rendered the indictment defective, and the written admission of the State's Attorney set out in the record, is that the alleged amendment was made "in the indictment;" from which the necessary inference would be that the change was made in *each count* of the indictment. The fifth and sixth paragraphs of the motion however specifically state that this change was made in the *first count* of the indictment, which at once suggests that it was made *only* in *the first count,* and at the argument it was expressly stated that it was made *only in the first count,* as shown by the docket entries then filed.

It is established by all the authorities that the name of a person in an indictment is matter of substance which cannot be changed without the consent of the grand jury, and that the Christian, as well as the surname is included in this rule. *Wharton's Crim. Pr. and Pl.,* 9th ed., sec. 109; 10 *Enc. Pl. & Pr.* 688–690; *Hawthorne* v. *State,* 56 Md. 535. An instrument thus changed is no longer the indictment found by the grand jury. 1 *Bishop's Crim. Procedure,* sec. 710; *Ex parte Bain,* 121 U. S. 1; *Byers* v. *State,* 63 Md. 207.

Neither the State's Attorney, nor the Court, nor both together, can supply the necessary authority, which can only come from the grand jury, in the absence of some statutory provision. The only provision in our Code for amendment of an indictment in case of misnomer are found in sections 283 and 284 of Art. 27. Sec. 283 provides for the misnomer of the defendant, and is applicable only where the misnomer is pleaded in abatement, when the amendment must conform to the true name disclosed in the plea of abatement. Sec. 284

provides for the amendment of an indictment when the name
of any person other than the defendant, has been erroneously
set forth therein.    Such amendment is made according to the
proof in the cause; but this is authourized only after a jury has
been sworn on the indictment, and in the case before us, the
amendment was made before the jury was sworn.    It is con-
sequently of no avail, and if the amendment had been made
in both counts of the indictment, it would have vitiated the in-
strument.    But having been made only in the first count, the
second count remained a valid subsisting count, sufficient to
sustain the verdict if otherwise justified, and the motion to
quash being addressed to both counts, was properly over-
ruled.    That this motion was the proper mode of presenting
the objection, we think must be regarded as settled in this
State by the case of *Byers v. State*, 63 Md. 210, in which the
mode of returning presentments and bills of indictment by
grand juries and filing them by the clerks, and the practice
regulating the correction of errors therein, was fully and care-
fully considered by the late JUDGE MILLER.    In that case,
which was an indictment for bigamy, there was a blank in
the indictment as returned by the grand jury, for the name of
the woman whom he has charged to have married during the
life of his wife, and on the following day, *while the grand jury
was still in session,* the foreman and the State's Attorney
called the attention of the Court to the omission, and the
grand jury thereupon appeared at the bar of the Court and re-
quested the return of the indictment for the purpose of filling
the blank, which was ordered, and the blank was filled by the
grand jury in their room, and the indictment subsequently re-
turned and delivered to the Court.    On motion in arrest of
judgment, based on affidavits, the Court held that the alleged
error was not apparent on the face of the record, and that the
question could not be thus raised, and that what the grand
jury did was substantially the same thing as finding a *new in-
dictment*.    The learned Judge however said, "In this state of
case, no doubt the more regular, formal, and safer course,
would have been for the State's Attorney to have had this in-

dictment quashed, and to have framed a new one and sub-
mitted it to the grand jury for their approval. 1 *Chitty's
Crim. Law*, 325; 2 *Hale's Pleas of the Crown*, 162; *Bacon's
Abridgment, Indictment D*."

The second, third and seventh exceptions relate to the con-
fession admitted in evidence. This confession was made to
Mr. Marley, a reporter of the "Evening News," by the de-
fendant while in jail, in the presence of the Deputy Sheriff and
the Jail Warden, and was taken down in short hand by Mr.
Linzey, who stated that he knew of no inducements offered
by Mr. Linzey, but that he did not recollect what Mr. Linzey
said at the time. Mr. Marley was not in Court when the con-
fesssion was offered, owing to his sickness, and defendant's
counsel asked that the confession be not received until Mr.
Marley could be examined in regard to it, but the Court ruled
it should be read in evidence at once, and this constitutes the
second exception. Before the confession was read, the de-
fendant asked the Court to limit the confession in its effect,
and to rule for what purposes it could be considered by the
jury, but the Court refused the request, and admitted the con-
fession for all purposes. This constitutes the third exception.

After the confession had been read in evidence, Mr. Marley
was sworn for the defendant, and stated that he told him he
need not say anything unless he desired, but that he also
told him "it would be possibly better for him if he would make
a clean statement, so it would not appear erroneously in the
papers; that the papers would get it anyway, and as my paper
was an evening paper, the correct statement would come out
first."

The third exception does not make clear what limitation
was sought to be imposed upon the effect of the confession, or
what ruling was asked of the Court, and it is for this reason
unnecessary to consider it, but we are clearly of opinion that
there was error in the rulings on the second and seventh ex-
ceptions. No confession is admissible unless freely and
voluntarily made. In the language of BARON PARKE, "You
are bound to satisfy me that the confession which you propose

to use in evidence against the prisoner, was not obtained from him by improper means." 2 *Denn. Crown Cases,* 448, note to *Queen* v. *Warringham.* The law is settled that the burden of showing affirmatively that it was not so induced in any given case is upon the prosecutor. *Green* v. *State,* 96 Md. 386; *Nicholson* v. *State,* 38 Md. 153; *Bram* v. *U. S.,* 168 U. S. 581. Here there was no attempt to discharge this burden of proof, and the confession was therefore improperly admitted. After its admission, Mr. Marley was sworn and frankly admitted that he found the defendant shortly after the tragedy, on the same day, in a nervous and depressed condition, covered with blood from a wound on the side of his head behind the ear, and apparently suffering from shock; and that he told him "it would possibly be to his advantage to give the correct statement of the affair."

Upon this state of proof we cannot hesitate to hold that a confession thus obtained and admitted should have been withdrawn from the jury.

Though the conclusion we have reached requires the reversal of the judgment, it is necessary to consider the remaining exceptions, as a new trial must be awarded.

Ever since the case of *Townshend* v. *Townshend,* 7 Gill, 10, it has been settled law in this State, in cases where mental sanity is in issue, that a non-expert witness may give his opinion in evidence, in connection with his personal observation of the facts upon which it is founded, and as derived from them. It must appear that the witness had adequate opportunity for forming a rational conclusion, since the mere opinions of witnesses are entitled to little or no regard unless they are founded on facts which warrant them in the opinion of the jury. "If the reasons are frivolous or inconclusive, the opinions of the witness are worth nothing." The weight to be given to such an opinion is for the jury, subject of course to the qualification that where the facts stated are such as would not, in the judgment of the Court, enable any rational mind to draw any conclusion therefrom, the opinion proposed to be given may be properly excluded. In *Conn. Ins. Co.* v. *Lath-*

*rop*, 111 U. S. 620, MR. JUSTICE HARLAN said, "Where a cause fairly depends upon the effect or weight of testimony, it is one for the consideration and determination of the jury. * * * It should never be withdrawn from them unless the testimony be of such a conclusive character as to compel the Court, in the exercise of a sound legal discretion, to set aside a verdict returned in opposition to it * * *. The natural and ordinary operations of the human intellect, and the appearance and conduct of insane persons as contrasted with the appearance and conduct of persons of sound mind, are more or less understood and recognized by every one of ordinary intelligence who comes in contact with his species. The extent to with such opinions should control or influence the Court or jury, must depend upon the intelligence of the witness as manifested by his examination, and upon his opportunities to ascertain all the circumstances that should properly affect any conclusion reached."

Bearing these principles in mind we are of opinion that the facts testified to by Officer Hamilton are not such as that any rational conclusion as to the mental soundness of the accused can be deduced from them. He testified that he had known the accused for fifteen years and during that period was in frequent communication with him; that he was "a man of eccentric ways," and would tell "if he had money how he would turn it and make millions ; " that he had a great many "imaginary ideas," though witness knew "he could not accomplish anything he undertook in that way ; " that he would "fuss with his wife ; " that sometimes when he met witness he would say, "hello, Andy," and sometimes, "How are you, Mr. Hamilton ?"

This is the whole substance of his statement of facts, and we think there was no error in the ruling on the the 4th exception to the exclusion of Officer Hamilton's opinion.

Officer Mooney testified that he had known the defendant since November, 1900, and had seen him every day for seven or eight months; that on one occasion he discovered him alone in the cellar of the Park Conservatory, dancing and

calling himself. Doctor Watts; that on other occasions he had seen him while in uniform, and on duty as a park officer, turning somersaults for the children on the play·ground, and doing other things against the park rules; that he would discuss his family affairs, as he never heard any one else do; that he would abruptly change the subject of conversation, and walk away, and then suddenly return and talk of something else, and that it was not possible to carry on a continuous intelligible conversation with him.

Officer May testified that he had seen much of the defendant since August, 1900, and met him four or five times a day till he was dismissed from the force, and had frequently noticed his strange and peculiar conversation; that whenever they would meet, and would enter into any conversation, Watts would leave him and start up the road, and then call to him that he would be back in ten minutes; that when he returned witness would ask him what took him off, and he would reply he just wanted to go up the road; that he could not talk continuously upon any subject; that he held his head down while talking, and sometimes you could see his eyes rolling; and that he had seen him while on duty playing with the children, crawling on his hands and knees, "bending the crab," and sometimes "sitting down in the sand pile, patting sand and water, the same as the children." The Court refused to allow either of these witnesses to give his opinion derived from these facts, as to the defendant's sanity. In these rulings on the fifth and sixth exceptions we think there was error, as we cannot say that no rational mind observing the conduct detailed could draw any conclusion therefrom.

George C. Miller, a cousin of defendant, testified that he was acquainted with Watts' grandmother who died when about eighty years of age, and that several years before her death "her mind left her entirely, and she was crazy;" that when Watts' mother died at the age of seventy "her mind was gone;" and that Watts' brother Richard, "had fits, and had a very weak mind."

Some direct proof of the insanity of the accused having been offered, it was competent to prove that insanity existed in the family.  *Berry* v. *Safe Deposit Co.*, 96 Md. 63.  But the defendant then asked the witness if he was able to say from his association with Mr. Watts whether he was of sound mind, to which the State objected, and the Court sustained the objection.  He then asked the witness to state what his opinion upon that subject was, to which the State also objected, and the Court sustained the objection.  These constitute the eighth and ninth exceptions.  The testimony as to Watts' relatives afforded no foundation for this question, and the vague and meagre reference by Miller to his appearance on the single occasion when he spoke of seeing him, gave no better basis for the question.

The tenth exception was taken to the allowance by the Court of a long hypothetical question put by the State to Doctor Hill, an expert on insanity, to which he replied that upon the facts given he could not say either that the person described was sane or insane.

In appellant's brief the ground of the exception was stated to be that there was no evidence in the cause upon which to base the question.  The defense had put to Dr. Hill upon his examination in chief, without objection, a much longer hypothetical question, to which he had replied that upon the facts stated he would say a man with those characteristics was of unsound mind.  An examatioinn of the record shows that it embraces only a very small part of the facts assumed in either of these hypothetical questions, but we do not discover that there is any material difference in the facts upon which the two questions are based, or that the question objected to, omits or withholds any facts stated in the question for the defence, or which were material to elicit a definite and intelligent reply, the difference between the two being chiefly in the collocation and condensation of the facts stated in each.

Why the expert was able to answer one definitely and positively, but could not answer the other either way, we are not required to decide, and do not do so.

Moreover, the question not being really answered at all, no injury could result from its allowance, even if otherwise open to objection. *Devoe* v. *Singleton*, 80 Md. 68.

The eleventh exception was taken to each of a series of questions put by the State on cross-examination to Doctor Hill, and apparently designed to discredit him as an alienist by showing that he was the same Doctor Hill who testified as an expert for the caveators in the Berry Will case, where the finding was against the will on the ground of the testator's insanity, but where many of the rulings on the hypothetical questions put to him were reversed on appeal ; and also by showing that he was an expert witness to prove the insanity of one Klein indicted for murder, who was found by the jury to be insane, but who within a few months thereafter made application to be discharged from the asylum as sane, and not being discharged, subsequently escaped to Virginia whose Courts declined to surrender him to the authorities of the asylum. An expert witness is not to be discredited as such because of the reversal of rulings on questions put to him at the trial below in another case, and it was wholly immaterial to any issue in this case whether Doctor Hill was a witness in the cases referred to, or whether Klein was subsequently declared to have recovered his reason, and the ruling on this exception was erroneous.

The twelfth and thirteenth exceptions were taken to the allowance of questions put to Doctor Hollingsworth, an expert on mental diseases, on cross-examination by the State, but as neither of these questions appear to have been answered at all by the witness, they are not the subject of review here. *Devoe* v. *Singleton, supra.* The State, in rebuttal of defendant's testimony upon the question of insanity, asked Dr. Blades, who attended the family of Watts whether he had ever heard any intimation before the day of the tragedy that anything was mentally wrong with Watts, to which he replied he had not, and the admission of this question and answer is the subject of the fourteenth exception.

There was no evidence that the Doctor had ever attended

Watts himself, or had occasion to question his insanity. Suspicions of this nature, if entertained by relatives, are often sedulously concealed from friends and from the physician of the family, and we do not think that the mere fact that an attending family physician had never heard of any such infirmity should be admitted to the possible prejudice of the defendant.

The fifteenth exception was to the same question put to Dr. Van Bibber, as was previously put to Dr. Hill by the State, and comes within our ruling on the tenth exception.

For the errors we have indicated the judgment must be reversed.

*Judgment reversed, and new trial awarded.*

(Decided February 19th, 1904.)