# STATE OF MARYLAND *v.* JOHN FRANCIS CONN

[No. 19, September Term, 1979.]

*Decided December 7, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH and COLE, JJ.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Bradford C. Peabody, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We hold that in this case the Court of Special Appeals erred in concluding that the testimony here in controversy constituted an opinion by a lay witness on the ultimate issue of sanity. Consequently, we shall reverse the judgment of the Court of Special Appeals in *Conn v. State,* 41 Md. App. 238, 396 A.2d 323 (1979).

We here conclude that under proper circumstances when an accused claims under Maryland Code (1957, 1972 Repl. Vol.) Art. 59, § 25 (a) that he is not guilty by reason of insanity at the time of the commission of an alleged crime, a layman, based upon his observations, may express his conclusion or impression that an individual seemed to be mentally normal or abnormal. This is so because, as it was put in *Carter v. United States,* 252 F.2d 608, 618 (D. C. Cir. 1957), "Normal conduct and abnormal conduct are matters of common knowledge, and so lay persons may conclude from observation that certain observed conduct is abnormal." Such testimony is relevant to the issue raised by the defense of the accused under § 25 (a). Accordingly, the Court of Special Appeals erred when it said that "the rule in *Watts* [*v. State,*

99 Md. 30, 57 A. 542 (1904),] is no longer viable." [*Id.* 41 Md. App. at 249.]

For the purpose of the case here the facts are not in dispute. John Francis Conn was 16 and the victim 19 years old at the time of her death. They were co-workers who apparently had found pleasure in each other's company for some months prior to the incident in question. Conn was admitted to the victim's home at approximately 7:30 p.m. on the evening of her death. Shortly thereafter screams were heard from the decedent's bedroom. The victim ultimately was found lying in a pool of blood. She had been fatally stabbed 19 times. Conn was taken into custody at approximately 8:00 p.m. on the same night and charged with murder. He entered pleas of not guilty by reason of insanity and not guilty. A Baltimore County jury convicted him of murder in the first degree.

At trial the following witnesses were called in the following order: the victim's mother, her sister, her father, the police officer who went to the victim's home at approximately 7:50 p.m. in response to directions received by radio, the medical examiner, a second police officer who arrived at the victim's home at approximately 8:00 p.m., and Officer Joseph Thompson. The second officer identified Conn as one of the people he saw when he entered the victim's residence. He testified that at that time Conn was crying, having his face in a towel. The record then reflects:

> Q What, if anything, did the Defendant say when you entered the home?
>
> A When the Defendant saw I was a police officer he stood up in the chair and said: "Is she dead?"
>
> Q Now, Officer, would you describe for the ladies and gentlemen of the jury what the appearance and the actions of the Defendant were when you saw him that evening?
>
> A Yes, sir. The Defendant was, as I mentioned, was crying. He was sitting there with his face into a towel and was crying.
>
> Q What did you do after the Defendant made the statement to you?

A At that point I walked up the remaining stairs and took the subject into custody, handcuffed him.

The officer was then asked if he transferred custody to anyone else. He replied that he did, to Officer Joseph Thompson.

The next witness was Officer Thompson. He said that he reached the victim's home at approximately 8:00 p.m. His purpose was "in search of a possible stabbing suspect [who] was supposedly at that location." On arrival he saw Conn in custody. After Officer Thompson's identification of Conn as the person then on trial, the record is:

Q Can you describe to the ladies and gentlemen of the Jury what the Defendant Mr. Conn's demeanor was, how he was acting? What was his appearance?

A He was obviously crying. He was somewhat grief-stricken. He seemed to be fit of mind. There wasn't any situation where he seemed to be suffering from any kind of illness. It seemed to be primarily grief.

MR. GEDE: I object.

A He was aware of what was going on when we talked to him.

MR. GEDE: I object and ask that it be stricken, that he didn't seem to have any illness.

THE COURT: That he observed. Overruled. Continue.

Officer Thompson then testified as to his search of Conn, and that while he was "patt[ing Conn] down [Conn] advised: 'I am not armed, I have thrown the weapon away, or I have thrown the knife away.'" The Court of Special Appeals said that this testimony by Officer Thompson was "that the appellant was not mentally ill." *Id.* at 239.

The State framed the following three questions to us in its request for the writ of certiorari:

1. Did the Court of Special Appeals erroneously conclude that the testimony of police officer

Thompson constituted an opinion by a lay witness on an ultimate issue regarding the sanity of Respondent?

2. Assuming, *arguendo,* that the testimony of Officer Thompson was inadmissible, was its admission under the circumstances of this case harmless error?

3. Did the Court of Special Appeals err in holding that the decision of this Honorable Court in *Watts v. State,* 99 Md. 30 (1904), is no longer viable?

### I. The *Watts* Rule

We shall first consider the viability of the rule enunciated in *Watts* and the circumstances under which a lay opinion as to mental capacity may be expressed.

In *Watts* the trial court had sustained the objection of the State to the testimony of three fellow policemen of the accused. Judge Pearce said for the Court:

> Ever since the case of *Townshend v. Townshend,* 7 Gill, 10 [(1848)], it has been settled law in this State, in cases where mental sanity is in issue, that a non-expert witness may give his opinion in evidence, in connection with his personal observation of the facts upon which it is founded, and as derived from them. It must appear that the witness had adequate opportunity for forming a rational conclusion, since the mere opinions of witnesses are entitled to little or no regard unless they are founded on facts which warrant them in the opinion of the jury. "If the reasons are frivolous or inconclusive, the opinions of the witness are worth nothing." The weight to be given to such an opinion is for the jury, subject of course to the qualification that where the facts stated are such as would not, in the judgment of the Court, enable any rational mind to draw any conclusion therefrom, the opinion proposed to be given may be properly excluded. In *Conn. Ins. Co. v. Lathrop,* 111 U.S. [612,] 620, [4 S.Ct. 533, 28 L.Ed.

536 (1884),] Mr. Justice Harlan said, "Where a cause fairly depends upon the effect or weight of testimony, it is one for the consideration and determination of the jury. * * * It should never be withdrawn from them unless the testimony be of such a conclusive character as to compel the Court, in the exercise of a sound legal discretion, to set aside a verdict returned in opposition to it * * *. The natural and ordinary operations of the human intellect, and the appearance and conduct of insane persons as contrasted with the appearance and conduct of persons of sound mind, are more or less understood and recognized by every one of ordinary intelligence who comes in contact with his species. The extent to which such opinions should control or influence the Court or jury, must depend upon the intelligence of the witness as manifested by his examination, and upon his opportunities to ascertain all the circumstances that should properly affect any conclusion reached." [*Id.* at 36-37.]

The Court then proceeded to consider the testimony of each of those individuals. One officer testified he had known the accused for 15 years during which time they were in frequent communication with each other; that the accused was a man of eccentric ways; that he would tell how if he had money he would turn it and make millions; that he had many imaginary ideas; that he would frequently "fuss with his wife"; and that sometimes when he met that particular witness he would greet him by his first name and at other times used "Mr." and his last name. The Court said it was of the opinion that these facts were "not such as that any rational conclusion as to the mental soundness of the accused c[ould] be deduced from them." However, it held that the trial court had erred in denying the admission of the testimony of two other officers. The point is illustrated by reference to what the Court said as to one of them:

Officer May testified that he had seen much of the defendant since August, 1900, and met him four or

five times a day till he was dismissed from the force, and had frequently noticed his strange and peculiar conversation; that whenever they would meet, and would enter into any conversation, Watts would leave him and start up the road, and then call to him that he would be back in ten minutes; that when he returned witness would ask him what took him off, and he would reply he just wanted to go up the road; that he could not talk continuously upon any subject; that he held his head down while talking, and sometimes you could see his eyes rolling; and that he had seen him while on duty playing with the children, crawling on his hands and knees, "bending the crab," and sometimes "sitting down in the sand pile, patting sand and water, the same as the children." [*Id.* at 38.]

No reversible error was found in *Baldwin v. State*, 226 Md. 409, 174 A.2d 57 (1961). In his opinion for the Court there Chief Judge Brune mentioned *Watts* and the rule relative to lay witnesses:

The testimony of the two lay witnesses which was not admitted pertained to their respective contacts with and observations of the defendant, one in the afternoon, the other in the evening of the day preceding the shooting. We agree with the defendant's contention that the testimony of lay witnesses as to their observations of a defendant's conduct and condition is ordinarily admissible, and if sufficient, that their conclusions based thereon with regard to his sanity are also admissible. *Watts v. State,* 99 Md. 30, 57 A. 542, a murder case. Cf. *Price v. State,* 159 Md. 491, 495, 151 A. 409 [(1930)], also a murder case (testimony by lay witnesses as to facts from which an inference of insanity might be drawn). See, also, among non-criminal cases involving mental capacity: *Townshend v. Townshend,* 7 Gill 10; *Doyle v. Rody,* 180 Md. 471, 25 A.2d 457 [(1942)]; *Sellers v. Qualls,* 206 Md. 58,

110 A.2d 73 [(1954)]; *Masius v. Wilson,* 213 Md. 259, 131 A.2d 484 [(1957)]; and *West v. Fidelity-Baltimore National Bank,* 219 Md. 258, 147 A.2d 859 [(1959)]. [*Id.* at 413.]

The rule relative to lay testimony as to mental capacity in civil cases was summarized and explained for the Court by Judge Hammond in *Masius v. Wilson,* 213 Md. 259, 131 A.2d 484 (1957):

> The rule is established in Maryland that the statement of a non-expert witness as to the sanity or insanity of one whose appearance and conduct have come under his personal observation is not the expression of mere opinion but actual knowledge of a fact. Yet the opinion cannot be given unless a proper factual basis has been laid for it. The limitation is well expressed in *Doyle v. Rody,* 180 Md. 471, 481: "But a non-expert witness is qualified to express an opinion as to a testator's mental capacity only where the acts and circumstances, of which the witness had personal knowledge, are sufficient to form a basis for the formation of rational opinion. He must state the facts as far as he can and disclose what led to his conclusion. If the whole testimony of the witness fails to show facts sufficient to justify the conclusion reached by him, he should not be permitted to express an opinion." The presumption that a person is sane and has remained sane lasts until the contrary is established. For this reason, evidence tending to show incapacity must relate to the critical date, whereas evidence as to competency may extend further afield, both before and after the critical date. It may be that the principle that underlies this distinction, although not articulated in the cases, has found expression and effect in the decisions as to what is a factual basis for an opinion by a lay witness. The test has been strictly applied in cases where the witness has sought to testify as to incapacity. *Johnston v. Schmidt,* 158 Md. 555, 566-567 [, 149 A. 283 (1930)]; *Plummer v. Livesay,*

185 Md. 450, 456-457 [, 44 A.2d 919 (1945)]; *Smith v. Biggs,* 171 Md. 528, 534, 535 [, 189 A. 256 (1937)]; *Sellers v. Qualls,* 206 Md. 58, 67, [110 A.2d 73 (1954)]. In cases where the opinion of the lay witness was that the tranferor was mentally sound, it has been admitted on factual bases seemingly no more extensive and detailed than those found insufficient where the opinion was as to incapacity. See *Bowers v. Kutzleb,* 149 Md. 308, 317 [, 131 A. 463 (1925)]; *Cronin v. Kimble,* 156 Md. 489, 499, 500 [, 144 A. 698 (1929)]; *Harris v. Hipsley,* 122 Md. 418, 434, 435 [, 89 A. 852 (1914)]; *Grill v. O'Dell,* 113 Md. 625, 633 [, 77 A. 984 (1910)]. [*Id.* at 268.]

*See also Sachs v. Little,* 245 Md. 343, 351, 226 A.2d 283 (1967); P. Sykes, *Contest of Wills in Maryland* § 67 (1941); and A. Bagby, Jr., *Maryland Law of Executors and Administrators* § 20 at 35-36 (2d ed. rev. 1927).

Early in its opinion in this case, citing *Gregory v. State,* 40 Md. App. 297, 328-29, 391 A.2d 437 (1978), and *Bremer v. State,* 18 Md. App. 291, 307 A.2d 503, *cert. denied,* 269 Md. 755 (1973), and 415 U.S. 930 (1974), the Court of Special Appeals said, "Although this Court has previously indicated, in dicta, that the opinion of a lay witness on the ultimate question of an accused's sanity is inadmissible, it has never so held." *Id.* 41 Md. App. at 240.

In *Gregory,* as the Court of Special Appeals there put it, "Defense counsel sought, unsuccessfully, to question the various bank employees who testified for the State about their perception and opinion as to appellant's rationality at the time of the incident." *Id.* at 328. The court said:

It is clear that lay witnesses are incompetent to render an opinion as to a defendant's "sanity". Such an opinion may be rendered only by a "medically trained psychiatrist", or, since July 1, 1978, by a certified psychologist. *See Saul v. State,* 6 Md. App. 540 [, 252 A.2d 282] (1969), *aff'd* [*on other grounds*], 258 Md. 100 [, 265 A.2d 178 (1970)]; *Bremer v. State,* 18 Md. App. 291, 317, 318 (footnote 9) (1973),

*cert. denied* 415 U. S. 930; Laws of Md., 1978, ch. 481. To the extent that the opinions sought to be elicited from these lay witnesses were intended to bear upon the issue of appellant's responsibility — *i.e.,* sanity — the witnesses were not competent to give them. *Id.* at 328-29.

In *Bremer* a special plea had been entered raising the defense of insanity. He had been ordered delivered to the custody of Clifton T. Perkins State Hospital in order that an examination be there made by the Department of Mental Hygiene for the purpose of determining whether he was insane at the time of the commission of the alleged offenses and whether he was of such mental incapacity as to prevent him from properly conducting his defense. He contended that the trial court erred in not rescinding its order for the mental examination. The court discussed Bremer's contention that such a mental examination would infringe upon his right against self-incrimination. It said in the process of that discussion, "The State should not have to rely on examinations made only by experts chosen by Bremer, leaving it with recourse only to cross-examination of them, or to its selected experts whose testimony would be predicated upon courtroom observations and hypothetical questions." *Id.* at 317. It was in this context that a footnote was placed which read:

> **9.** An opinion by a layman on the matter of insanity is inadmissible. An opinion as to the ultimate fact, whether or not the accused is insane under the appropriate test, "in fairness both to the accused and the State, should be reached by a medical diagnosis. Thus the opinion must be made by a medically trained psychiatrist in order to be admissible in evidence." *Saul v. State,* 6 Md. App. 540, 549-550. [*Id.* at 317-18.]

In *Saul v. State,* 6 Md. App. 540, 548, 252 A.2d 282 (1969), it was contended that the trial court had erred in excluding the opinion of a clinical psychologist "that [Saul] was suffering from a mental disease or defect and lacked

substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." This testimony was not based upon observations of the accused similar to that made in *Watts* and *Masius* and commented upon in *Baldwin.* In short, what was contemplated was an opinion no different from the opinion which would be offered by a psychiatrist after examination of the accused. It was in this context that the statement quoted in the footnote in *Bremer* was made.

It thus will be seen that *Gregory* is the only opinion of the Court of Special Appeals cited by it in this case which is factually analogous to the issue now before the Court. It further will be seen that the cases cited in *Gregory* actually did not address the type of situation with which we are here confronted.

The so-called *M'Naghten* Rule (from *Regina v. M'Naghten,* 10 Clark & F. 200, 8 Eng. Rep. 718 (1843)) was adopted in an opinion by Chief Judge Alvey for this Court in *Spencer v. State,* 69 Md. 28, 37, 13 A. 809 (1888).[1] In 1957 the General Assembly directed the Legislative Council to appoint a committee to study the Maryland laws for the commitment of mentally ill persons. A number of distinguished Maryland doctors, lawyers, judges, and legislators were appointed and constituted the Committee to Study Commitment Laws.[2] It submitted its report to the Legislative Council in December

---

1. Chief Judge Alvey there said for the Court:

> [A]ccording to the law, as we find it settled by the great preponderance of judicial authority, if the party accused be competent to form and execute a criminal design; or, in other words, if at the time of the commission of the alleged offense, he had capacity and reason sufficient to enable him to distinguish between right and wrong, and understand the nature and consequences of his act, as applied to himself, he is a responsible agent, and amenable to the criminal law of the land for the consequences of his act. This is the leading test as applied by the courts of England, and certainly by a very large majority of the courts in this country. [*Id.* 69 Md. at 37.]

2. Members of the committee included Judge J. Dudley Digges and Senator Harry A. Cole, now both members of this Court. The committee chairman was Dr. Manfred S. Guttmacher, a distinguished Baltimore psychiatrist, who was then Chief Medical Officer of the Supreme Bench of Baltimore City.

1958. Its recommendation as to the proper test to be applied in criminal cases ultimately was adopted by Chapter 709 of the Acts of 1967, then codified as Code (1957, 1967 Cum. Supp.) Art. 59, § 9 (a), now Code (1957, 1972 Repl. Vol.) Art. 59, § 25 (a), currently saying:

> (a) A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disorder,[3] he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms "mental disorder" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

This rule derives from the Model Penal Code of the American Law Institute, § 4.01.[4]

---

3. Chapter 709 of the Acts of 1967 referred to "conduct as a result of mental disease or defect...." No amendments were inserted in the trip of the bill through the General Assembly. The recommendation of the Commission spoke of "mental disease or deficiency."

4. It reads:

> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.
>
> (2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct. [Brackets in original.]

It is of interest that in Spencer v. State, 69 Md. 28, 13 A. 809 (1888), there was a dissent in which Judge Bryan said with the concurrence of Judge Yellott:

> If from mental disease or from feebleness of intellect a person has not sufficient power of self-control to govern his actions, it would be inhuman and unreasonable to hold him to criminal responsibility. If, on the other hand, his mind is rational and sound, and he commits acts of violence while under the dominion of turbulent and malignant passions, he is justly liable to the uttermost penalties of the law. But between these extreme limits, many intermediate cases may exist. The mind may be so enfeebled, and the power of the will so weakened, that the man may be overpowered by temptation too strong for him to resist; and he may act under its influence without having the "sedate, deliberate mind

Art. 59 of the Maryland Code, formerly entitled "Lunatics and Insane," was repealed and reenacted as the Mental Hygiene Law by Chapter 407 of the Acts of 1970. At that time a definition of "mental disorder" was inserted. Code (1957, 1972 Repl. Vol.) Art. 59, § 3 now reads in pertinent part:

(f) *"Mental disorder"* means mental illness or any other form of behavioral or emotional illness resulting from any psychiatric or neurological disorder. The term shall not include mental retardation.

(g) *"Mental illness"* means any mental disorder which so substantially impairs the mental or emotional functioning of an individual as to make it necessary or advisable for the welfare of the person so suffering or for the safety of the persons or property of others that the mentally ill person receive care and treatment. The term shall replace the words "insane," "insanity," "lunacy," "mentally sick," "mental disease," "unsound mind" and similar words as they appear in the statutes of the State of Maryland.

In its opinion in this case the Court of Special Appeals pointed out that *Watts* was decided under the *M'Naghten* Rule. It reasoned (41 Md. App. at 246, 247) that after the revision of the test for insanity the Court of Special Appeals had expressed itself, as we have heretofore pointed out, on the admissibility of testimony as to the sanity of an accused;

---

and formed design" which are essential to express malice. [*Id.* at 48.]

It will be noted that they were advocating a rule similar in part to that ultimately adopted almost 80 years later.

Thomsen, *Insanity as Criminal Defense,* 19 Md. L. Rev. 271 (1959), reviews the *M'Naghten* Rule and suggestions for its change. Judge Thomsen opines:

The tests proposed by the American Law Institute and by the Maryland Committee have much to recommend them. They meet the principal criticisms of the right-wrong test. They also meet most of the objections to the *Durham* rule. They recognize the basic principle that the protection of society is the primary function of the criminal law. They should be given serious consideration by doctors, lawyers, judges and legislators. [*Id.* at 293.]

that "[u]nder the rules of statutory construction the Legislature is assumed to have knowledge of and to act in accordance with the decisions of the appellate courts" [5]; and that the General Assembly, "aware of [the Court of Special Appeals'] decisions indicating that only a physician could testify on the question of sanity, amended article 59" by substituting the words "mental disorder" for the words "mental disease or defect" appearing in the original version of the new Maryland test for insanity and then added the definition of those terms which we have heretofore quoted. The Court of Special Appeals then went on to say:

> The phrase "mental disease or defect," the definition of which had provoked disagreement among psychiatrists, was replaced by the term "mental disorder," a standard which psychiatrists could more readily define and uniformly apply, thereby improving the quality of psychiatric testimony. The term "mental disorder" was defined as a mental, behavioral or emotional *illness* and the words "insane and insanity" were equated with the words *mental illness,* thereby underscoring the medical nature of a determination of sanity. Finally, the term "mental illness" was defined as a disorder which so impairs an individual that it is necessary for him to receive care and treatment in order to protect himself or others, thereby establishing a standard analogous to that used to determine whether a person suffering from a mental disorder may be involuntarily committed. This analogy leads to the conclusion that because involuntary commitment is dependent upon a determination by two physicians that a person has a mental disorder and needs care

---

5. Supervisor v. Southgate Harbor, 279 Md. 586, 591-92, 369 A.2d 1053 (1977); Herbert v. Gray, 38 Md. 529, 532 (1873); and an opinion of the Court of Special Appeals were cited for this proposition. In *Southgate* we said, "The General Assembly when it enacted this statute is presumed to have been acquainted with *our* decisions and to have acted accordingly." *Id.* at 591-92. (Emphasis added.) A number of our prior cases make a similar observation. As was suggested during oral argument of this case, this proposition may not necessarily be applicable to an opinion of the Court of Special Appeals because the General Assembly might be of the view that in a proper case we would grant certiorari and rule to the contrary.

or treatment for his or others' safety, a finding on the ultimate question of sanity in a criminal action is also dependent upon a similar determination by a physician. Thus, these amendments establish that the Legislature implicitly agreed with this Court's conclusion that the question of sanity is a medical question and that an opinion on the ultimate question of an accused's "mental illness" or its equivalent "sanity" is admissible only if offered by a physician. [*Id.* at 247-48 (emphasis in original, footnotes omitted).]

It then pointed to the enactment of Chapter 481 of the Acts of 1978, now Code (1974, 1979 Cum. Supp.) § 9-120, Courts and Judicial Proceedings Article, providing:

Notwithstanding the provisions of Article 59 or the provisions of any other law, a psychologist certified under the "Psychologists' Certification Act" and qualified as an expert witness may testify on ultimate issues, including insanity, competency to stand trial, and matters within the scope of that psychologist's special knowledge, in any case in any court or in any administrative hearing.

The court then reasoned:

Thus, the Legislature opted to broaden the class of persons who could offer an opinion on mental illness or sanity by including, in addition to physicians, another group of specially trained professionals. It did not include lay persons within the class competent to offer such opinions. These circumstances establish that the Legislature intended that only physicians and psychologists and not laymen be permitted to offer opinions on the issue of an accused's mental illness or sanity. [*Id.* at 249.]

It was upon these bases that *Watts* was held to be "no longer viable."

The Court of Special Appeals seems to have overlooked the

fact that lay testimony in a case such as *Watts* is entirely different from that contemplated under this statute to come from a psychologist. The permissible lay testimony, as our cases indicate, is in the nature of a description of acts observed by the witness at a time relevant to the issue then before the court, be it a crime or the execution of a will or other legal instrument. Based upon these observations the lay witness would then express an opinion. The psychologist would not be testifying as to his observation of such acts, but at a time perhaps long after the relevant event would be interviewing an individual, administering tests to him, and from this examination then positing his view on the ultimate issue of sanity as of the time of the alleged crime.

The rule enunciated in *Durham v. United States*, 214 F.2d 862 (D. C. Cir. 1954), was "that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." The comment to § 4.01 of the Model Penal Code indicates that this view was rejected because of "the ambiguity of 'product.'" However, the similarity of that test to the one ultimately adopted by the American Law Institute, the modified version of which is in effect in Maryland, makes relevant here the expressions of the United States Court of Appeals for the District of Columbia Circuit under that rule. In *Carter v. United States*, 252 F.2d 608 (D. C. Cir. 1957), Judge Prettyman said for a panel composed of Judges Bazelon, Burger, and himself:

> The law wants from the medical experts medical diagnostic testimony as to a mental illness, if any, and expert medical opinion as to the relationship, if any, between the disease and the act of which the prisoner is accused. The conclusions, the inferences, from the facts are for the trier of the facts. All this Smith v. United States [, 59 App. D.C. 144, 36 F.2d 548 (1929),] implied and Durham was meant to bring about.
>
> In discussing, as we have, expert medical testimony, we have not overlooked the admissibility of lay testimony. Lay witnesses may testify upon observed symptoms of mental disease, because

mental illness is characterized by departures from normal conduct. Normal conduct and abnormal conduct are matters of common knowledge, and so lay persons may conclude from observation that certain observed conduct is abnormal. Such witnesses may testify only upon the basis of facts known to them. They may testify as to their own observations and may then express an opinion based upon those observations. Of course the testimony of a lay witness with training in this or related fields may have more value than the testimony of a witness with no such training. Also obvious upon a moment's reflection is the fact that, while a lay witness's observation of abnormal acts by an accused may be of great value as evidence, a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused. [*Id.* at 617-18.]

This Court said in *Giardina v. Wannen,* 228 Md. 116, 125, 179 A.2d 357 (1962), citing *Masius,* "It is well established, of course, that the foundation laid to permit an expression of opinion as to incapacity must be more substantial than one to express an opinion relative to mental capacity."

In 31 Am. Jur. 2d *Expert and Opinion Evidence* § 88 (1967), it is stated:

Opinion evidence upon an issue of sanity or insanity is not confined to the opinions of medical men — that is, expert testimony. It may not be possible for a physician not familiar by experience with some of the peculiar indefinable but certain symptoms of insanity to determine its existence without actually observing the person for a considerable length of time. It is now well established, in all except a very few jurisdictions, that a nonexpert witness who bases his testimony upon facts and circumstances known to, and related by, him, may be permitted to give opinion testimony

as to the sanity or insanity of a person whose mental condition is being investigated. Such testimony is perhaps not so much a mere opinion as a statement as to an observed fact.

The rules governing the competence of nonexpert witnesses to express opinions as to sanity or insanity are applicable in a criminal prosecution, as well as in a civil action. In criminal prosecutions as well as in civil cases, nonexpert witnesses are not permitted to express general opinions as to sanity or to give opinions independent of facts and circumstances within their own knowledge, but, as a general rule, those who are acquainted with the accused, or who have had sufficient opportunity to observe his conduct, may narrate the relevant facts known to them, and thereupon express an opinion as to his sanity. [*Id.* at 604-05.]

This is no isolated view. *See, e.g.,* 2 *Jones on Evidence* § 14:7 (6th ed. S. Gard 1972); 3 *Wharton's Criminal Evidence* § 609 at 175 (13th ed. C. Torcia 1973); 23 C.J.S. *Criminal Law* § 867 b (1961); and H. Weihofen, *Mental Disorder as a Criminal Defense* 301, 303 (1954). The reason for the rule is explained by Weihofen:

Psychiatrists have insisted that laymen are incompetent to form a sound judgment as to another's mental condition, on the basis of acquaintanceship or observation. Yet the law is not wholly wrong in permitting this. After all, the witness is merely permitted to contribute his bit of testimony. He does not determine the case, and he need not be believed. Medical men who sometimes deplore the "technicalities" of the law of evidence, which obstruct and even prevent the presentation of all the facts, may well ponder whether they really want the law to set up additional exclusionary rules.

Laymen are allowed to state their opinions as to another's mental condition for the reason that it is impossible for a witness to detail only the facts and

actions which indicate sanity or insanity, without stating his opinions or conclusions. A witness may from his acquaintance and observance of a certain person, feel convinced of his sanity or insanity, and yet not be able to remember all or even many of the incidents which led him to that conclusion. Even if he could remember them all, it is impossible for a witness to describe them without stating conclusions. [*Id.* at 303-04.]

7 J. Wigmore, *Evidence* § 1937 (Chadbourn rev. 1978), explains:

Opinion as to *sanity* and opinion as to general testamentary or criminal *capacity* are entirely distinct. The latter sort of opinion is inadmissible (when it is) because a question of law may be involved, and witnesses' conclusions are not needed on such points. Rulings excluding such opinions (§ 1958 *infra*) may well coexist with rulings receiving opinions as to sanity. [*Id.* at 49 (emphasis in original).]

Moreover, Federal Rule of Evidence 701 permits "testimony [of a nonexpert] in the form of opinions or inferences ... limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." It is significant as a consequence that Rule 704 goes on to provide, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

There have been but two changes in the law since the opinion in *Watts*: the enactment of the statute which permits a psychologist to testify as to mental capacity on the same basis as a psychiatrist and the substitution of the A.L.I. formula for that enunciated in *M'Naghten* and adopted in Maryland in *Spencer,* 69 Md. 28. There is a vast difference between the type of testimony previously permitted on the

part of lay individuals and the expression of opinion by a psychologist based upon tests he has administered to the accused. Thus, we do not see that enactment by the General Assembly as in any way undermining the rule set forth in *Watts*. It is true that a medical question is presented under Art. 59, § 25 (a) as to the sanity of the accused but for the reasons so clearly set forth by Professor Weihofen and as was so cogently observed in *Carter*, 252 F.2d at 618, "Normal conduct and abnormal conduct are matters of common knowledge, and so lay persons may conclude from observation that certain observed conduct is abnormal."

We have observed many times that the reception of evidence is to a large degree entrusted to the discretion of the trial court and its action will seldom constitute grounds for reversal. See generally, *e.g., Impala Platinum v. Impala Sales,* 283 Md. 296, 332, 389 A.2d 887 (1978); *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977); *Andrews v. Andrews,* 242 Md. 143, 152, 218 A.2d 194 (1966); *Smith v. State Roads Comm.,* 240 Md. 525, 214 A.2d 792 (1965); *Sanner v. Guard,* 236 Md. 271, 277, 203 A.2d 885 (1964); *Turner v. State Roads Comm.,* 213 Md. 428, 434, 132 A.2d 455 (1957); *Reid v. Humphreys,* 210 Md. 178, 185, 122 A.2d 756 (1956); *Barranco v. Kostens,* 189 Md. 94, 97, 54 A.2d 326 (1947); *Zeller v. Mayson,* 168 Md. 663, 667, 668, 669, 179 A. 179 (1935); *Ice Machinery Corp. v. Sachs,* 167 Md. 113, 126, 173 A. 240 (1934); and *Maryland Electric Ry. v. Beasley,* 117 Md. 270, 277, 83 A. 157 (1912). The reason for such a rule is well illustrated in the context of this case in *McCormick on Evidence* § 11 (1972, 2d ed. Cleary):

> This classic formula, based as it is on the assumption that "fact" and "opinion" stand in contrast and hence are readily distinguishable, has proven the clumsiest of all the tools furnished the judge for regulating the examination of witnesses. It is clumsy because its basic assumption is an illusion. The words of the witness cannot "give" or recreate the "facts," that is, the objective situations or happenings about which the witness is testifying. Drawings, maps, photographs, even motion pictures,

would be only a remote and inaccurate portrayal of those "facts" and how much more distant approximations of reality are the word pictures of oral or written testimony. There is no conceivable statement however specific, detailed and "factual," that is not in some measure the product of inference and reflection as well as observation and memory. The difference between the statement, "He was driving on the left-hand side of the road" which would be classed as "fact" under the rule, and "He was driving carelessly" which would be called "opinion" is merely a difference between a more concrete and specific form of descriptive statement and a less specific and concrete form. The difference between so-called "fact," then, and "opinion," is not a difference between opposites or contrasting absolutes, but a mere difference in degree with no recognizable line to mark the boundary. [*Id.* at 23-24.]

To like effect, almost word for word, see C. McCormick, *Some Observations Upon the Opinion Rule and Expert Testimony,* 23 Tex. L. Rev. 109, 111 (1945). See also the discussion in 31 Am. Jur. 2d *Expert and Opinion Evidence* § 161 (1967) relative to nonexpert opinion evidence relative to emotions such as fear, anger, joy, excitement, nervousness, earnestness, anxiety, disgust, curiosity, surprise, embarrassment, sympathy, despondency, displeasure, and satisfaction. It indicates, "Witnesses may testify that a person 'seemed to be frightened,' 'was greatly excited,' 'was much confused,' 'was agitated,' 'was pleased,' or 'was angry.'" *Id.* at 723-24.

Although the cases have spoken of "lay opinion" we suspect that better terminology would be "lay conclusion," "lay inference," or "impression." In fact, in the discussion by Mr. Justice Harlan for the Court in *Conn. Mut. Life Ins. Co. v. Lathrop,* 111 U.S. 612, 618, 621, 4 S.Ct. 533, 28 L.Ed. 536 (1884), (which case was quoted by this Court in *Watts*) he refers to the "impression" which has been made upon the mind of a lay witness. Moreover, it will be recalled that

Federal Rule of Evidence 701 speaks in terms of "testimony" in the form of opinions or *inferences* . . . ." (Emphasis added.) See also the discussion by Professor McCormick to which we have referred. In a case such as *Watts* what the lay person actually is doing is expressing in conclusory terms the inferences he has drawn from his observations. This was explained in *Townshend v. Townshend et al.,* 7 Gill 10 (1848), upon which *Watts* was based. The Court there said:

> It is stated by the elementary writers upon this subject, that the attesting witnesses [to a will] are considered in the law as placed round the testator, to protect him against fraud in the execution of his will, and to judge of his capacity; that the testator is intrusted to their care; and it is their duty to inform themselves of his capacity, before they attest his will; and it is on this ground, that these witnesses are permitted to testify as to the opinions they formed of the testator's capacity, at the time of executing his will. And it is equally true, as a general proposition, that the mere naked opinions of other persons, not occupying the position of medical men, are inadmissible in reference to the mental capacity of a testator, whose will may be controverted.

> But the testimony proposed to be submitted by the caveatees, to the jury as illustrative of the mental condition of the testator, was not the mere naked, isolated, unsupported opinion of the witness. The impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance, and acts of the testator in various business transactions, for a long series of years, is not mere opinion, it is knowledge, and strictly analogous to the cases of personal identity, and hand-writing, which are constantly established in the law Courts, by the opinion and judgment of persons who have enjoyed the opportunity of observing the person, or hand-writing sought to be identified, or proved. [*Id.* at 27-28.]

We point out that under *Watts* the statement by the lay nonexpert witness becomes trustworthy and thus admissible only after he demonstrates a sufficient foundation for the inference drawn. The testimony of an expert may be based upon his examination made weeks or even many months after the critical date. The expert from that examination is attempting to reconstruct the condition of the mind of the accused as of the critical date. The expert may never have seen the accused prior to the beginning of this examination. The nonexpert is testifying upon the basis of his observations of the accused over a sufficient period of time. We regard it as of material assistance to the jury to have the benefit of those lay observations together with his conclusion as to whether as of the time of the event in question the accused seemed to deviate or not to deviate from the established norms.

We do not go so far as to say that a lay witness may be questioned as to whether in his opinion an individual is responsible for his criminal conduct under Code (1957, 1972 Repl. Vol.), Art. 59, § 25 (a), since, as we have already observed, that is a medical question. He does not have an adequate basis for such an opinion. What we do say is that a lay witness may describe what he has observed which is relevant to the issues then on trial before the court and he may state what conclusions he has drawn based upon those observations if they have been conducted over a sufficient period of time to permit his reaching a conclusion. *Watts* remains viable. The Court of Special Appeals erred when it held to the contrary.

## II This Testimony

In *Watts* the Court said, "It must appear that the witness had adequate opportunity for forming a rational conclusion, since the mere opinions of witnesses are entitled to little or no regard unless they are founded on facts which warrant them in the opinion of the jury." *Id.* 99 Md. at 36. Accordingly, the testimony of Officer Thompson would not be admissible if it were an opinion. This is because the period of his observation was not sufficient under *Watts* and our other

prior cases for him to have acquired an adequate basis for his conclusion.

We do not, however, regard the statement to the effect that Conn did not seem "to be suffering from any kind of illness" as a conclusion. This testimony was nothing more than a declaration by the officer that he observed Conn's crying and, although Conn appeared to be grief stricken, there were no outward manifestations of his "suffering from any kind of illness," that he was so detached from his surroundings as to be unaware of that which was said to him, or that he was not "fit of mind." Accordingly, the trial judge was correct when he overruled the objection to the comment on illness stating, "That he observed."

## III The Remand

The appeal to the Court of Special Appeals in this case embraced issues which it found unnecessary to pass upon because of its conclusion concerning the viability of *Watts.* Accordingly, this case must be remanded to that court in order that it may consider those questions.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court for further proceedings consistent with this opinion; pursuant to Maryland Rule 882 a costs are not reallocated as part of the judgment of this Court.*